Carol L. GRIFFIN, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 86–295.

Supreme Court of Wyoming.

Jan. 21, 1988.

---

* BROWN, C.J., dissents and would grant the Petition for Rehearing to delay application of the decision to January 1, 1989.

Leonard D. Munker, State Public Defender, Martin J. McClain (argued), Deputy State Public Defender, Julie D. Naylor, Appellate Counsel, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., Karen A. Byrne, Asst. Atty. Gen. (argued), for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Following a jury trial upon a charge of first-degree murder, appellant Carol Griffin was convicted, for killing her husband, of voluntary manslaughter in violation of § 6–2–105(a)(i), W.S.1977, which provides:

"(a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:

"(i) Voluntarily, upon a sudden heat of passion * * *."

She received a sentence of eight to ten years in the Wyoming Women's Center.

On appeal, she states the issues as:

1. "Was the competent evidence presented to the jury insufficient to sustain the conviction of voluntary manslaughter."

2. "Was the introduction of Appellant's request for an attorney and her subsequent statements reversible error."

3. "Did the trial court improperly limit voir dire."

4. "Was it error for the Court to refuse proffered jury instruction F."

We affirm.

■ The critical question presented for our review is whether there was sufficient evidence to sustain appellant's voluntary manslaughter conviction. Appellant contends she was a battered wife who in self-defense shot and killed her husband. We must abide by our established rule that after conviction, on appeal, we view all the evidence in a light most favorable to the State, drawing all possible, reasonable inferences therefrom to determine whether any rational trier of fact could have found, beyond a reasonable doubt, the elements of the crime necessary for conviction. If, after viewing the evidence in this light, there exists sufficient evidence to support a conviction, the jury's verdict of conviction must be affirmed. *Capshaw v. State*, Wyo., 737 P.2d 740 (1987); *Dangel v. State*, Wyo., 724 P.2d 1145 (1986).

" 'Stated another way—it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State.' " *Grabill v. State*, Wyo., 621 P.2d 802, 803 (1980), quoting *Harvey v. State*, Wyo., 596 P.2d 1386, 1387 (1979). See also *Polston v. State*, Wyo., 685 P.2d 1 (1984).

It is claimed that appellant is a battered wife, i.e., a woman so physically, emotionally and psychologically destroyed by continuous, severe beatings that she has become an emotional cripple, unable to resist, unable to act, fearful of leaving, believing there is nowhere to turn and no one to help, unable to contemplate divorce or separation, who in utter desperation kills her husband. Thus it is said:

"Battered women have traditionally been reluctant to seek help. If 'seeking help' would not protect her from further physical abuse and if there was no place to go to escape from the assaults, then what was the use of seeking help? For many years this was the plight a battered woman faced. All too often these women have been ashamed of being victims of spouse abuse. They have endured repeated assaults because of an overriding desire to keep the family together, uncertainty over where to get legal aid and social work services, fear of poverty, guilt that they are in some way to blame for the abuse, and fear of intensified physical reprisals if they left home or filed a complaint against the husband." A. Roberts, Sheltering Battered Women, at 7 (1981).

Appellant hardly qualifies for what the literature describes as a battered wife. She was not afraid to contact the police, having done so on five prior occasions. Each time the police came to their residence, there was an argument between the parties over who had done what, who was

at fault; and in each instance appellant was enormously drunk. She had pushed Clyde Griffin out of the house on several occasions, fought with him and cut him with a broken bottle and knife, had employed a lawyer and entered into two separation agreements. The parties were separated at the time of the shooting. She had been married four times prior to this marriage to the deceased, three of those marriages ending in divorce. She knew how to get out of her marriage without killing Clyde Griffin. She could hardly have believed it necessary to kill him to terminate the relationship.

## FACTS

The appellant, Carol Griffin, married the deceased, Clyde Griffin, on July 1, 1983. It was appellant's fifth marriage and the deceased's first. The marriage, marked by alcohol abuse, separation and acts of violence by both husband and wife, ended with the death of Clyde Griffin on January 26, 1986.

The events leading to the killing began when David Lopez, Jeanette Alphin, Charles Kellogg and appellant met the evening of January 25, 1986, at appellant's mobile home in Cowley, Wyoming, to celebrate the birthday of Lopez. Everyone except Kellogg had been drinking before they moved the celebration to Powell, Wyoming. They returned to Cowley about midnight, and the party continued at Kellogg's mobile home until about 2:45 a.m. Sunday. Appellant remained at Kellogg's home until about 6:00 a.m. She and Kellogg then went to the appellant's home where, at 6:38 a.m., she telephoned Clyde at the ranch house near Byron where he was staying during the couple's separation. Ten or fifteen minutes later, Clyde called back to ask for help in getting a vehicle out of a ditch. Appellant and Kellogg traveled to the ranch bringing appellant's gun with them.

Appellant, Clyde and Kellogg practiced shooting the gun. It was the first time appellant had fired the gun. Kellogg and appellant then returned to appellant's home about 9:30 a.m. Kellogg cleaned the gun, reloaded it and placed it on a coffee table in appellant's living room.

At about 10:00 a.m., a neighbor, Melvin Buck, drove Clyde to appellant's home. Buck found Clyde to be friendly and calm. Clyde entered the trailer house, accused Kellogg of "bird dogging" his wife, and ordered Kellogg out of the mobile home. Kellogg started to leave when the appellant fired the gun, its bullet hitting a closet. Kellogg heard Clyde say: "[Y]ou are not going to shoot me, are you, Carol?" and before he reached the bottom of the steps, the appellant fired a second shot, striking and killing Clyde.

Appellant called the Big Horn County Sheriff's office in Lovell and informed the dispatcher that she had just shot her husband. Two deputies arrived at the mobile home five minutes later to find Clyde slumped against a wall, dead. While traveling to the sheriff's office in Lovell, appellant stated she would like to speak to an attorney and was advised that an attorney would be provided. At the sheriff's office, she waived her *Miranda* rights after they were read to her and was left in the custody of a Lovell police officer until transportation to the Big Horn County jail in Basin could be arranged. Although the officer asked no questions about the shooting incident, appellant started talking about it. When appellant asked if she should lie and say someone else shot Clyde, the officer suggested she say no more until she consulted with an attorney. A blood alcohol test showed her blood alcohol level to be .23 percent some three hours later.

Appellant's trial on the first-degree murder charge began on April 28, 1986. The jury rejected appellant's self-defense justification for the shooting and, on May 7, 1986, found her guilty of the lesser-included offense of voluntary manslaughter under § 6–2–105(a)(i), supra.

## SUFFICIENCY OF EVIDENCE

The State's evidence was directed to proof of premeditation, motive and malice necessary to establish murder in the first degree. Thus, witnesses testified that appellant would drink daily in bars, make

advances to other men, and other men would come on to her. The deceased's employer, Peterson, testified that "he [Clyde] was upset by her association with other fellows"; that "[h]e handled it much better than I would have," and one morning when Mr. Peterson gave appellant a ride as they drove past Kellogg's trailer, appellant said,

"Carol's down to Kellogg's, and he got out and walked down to the trailer. That was about 8:30.

"Q. In the morning?

"A. In the morning, yes.

"Q. Was—

"A. He was aware that she was staying down there at nights and this bothered him to some extent."

Sandra Folkerts testified:

"Q. Now then, did Clyde ever mention to you the relationship between his wife and Mr. Kellogg?

"A. Yes.

"Q. Was that causing him any concern?

"A. It was causing him a lot of grief, heartache.

\* \* \* \* \* \*

"A. He came to my house one night and he said that he had been over to Cowley and that Carol was at Chuck's house and he asked her for the checkbook and credit cards, he felt if she was going to have a relationship with Chuck he was not going to continue to support her, I guess, I don't know."

Mr. Garrett testified:

"Q. And did he ever mention any suspicions or fears he may have had about Mr. Kellogg?

"A. He said he felt Mr. Kellogg and Mrs. Griffin were having an affair."

There was also the testimony set forth in the dissent concerning a customer in a bar playing with appellant's breasts. There was not a single objection to any of this testimony. It is not surprising there was no objection, for such evidence is clearly relevant to motive, malice and plan to kill.

Doctor Welch, who saw appellant after their fights, testified: "She was under the influence of alcohol each time," and stated

further: "[M]y impression was that she was a pusher, Carol was a pusher. When she would get drunk she would drive him up the wall and whether it was a short fuse or not, it was understandable I felt at the time." And finally Dr. Welch stated that he never considered her injuries serious.

Mr. Lopez, a friend of appellant's, testified that the difficulties, verbal fights, and pushing were the result of alcohol and that "usually when things got pretty bad \* \* \* he [Clyde Griffin] would leave."

Mr. Whittman testified:

"A. Carol slapped Clyde.

"Q. What was his response to this?

"A. He was trying to hold her arms together and take her home because she was yelling and screaming and waking up the kids. I asked them to leave.

"Q. Did you ever see Clyde Griffin physically attack his wife during that altercation?

"A. No.

"Q. Were there any other instances which you witnessed or which you were party to which led you to form an opinion as to Carol Griffin's temper?

"A. Quite often she would start arguments with him."

Ms. Folkerts stated:

"A. He told me that he had to defend himself against her. He came to the house one time and mentioned to me that she had broken a bottle and gone after him with it in their home. And he came to me at a different time and told me that she had gone after him with a butcher knife.

"Q. Did you ever see any indications of injury on him?

"A. He had wrapped his arm one day and said it was cut. It was wrapped when he came over and he was telling me about one of these incidents, yes. He told me another time that she pushed him out the back door of the trailer and they had no steps."

For five months the parties were separated pursuant to two separation agreements. Upon the expiration of the agreements, they lived together for about two

months when, on December 22, 1985, decedent again moved out of the trailer. During all of this time Clyde Griffin was appellant's sole support. For the last five months Clyde Griffin had stopped drinking, was attending Alcoholics Anonymous, and was living alone at the house on his parents' ranch. His employer had suggested to him that he get a divorce. Clyde Griffin informed Ms. Folkerts one night that he was thinking about "changing his will and getting a divorce * * *." The jury could have inferred that appellant was interested in other men; was having an affair with one of them; that while separated she was being supported by Clyde Griffin; that if she and Clyde were divorced she would have no further support, but if he died while they were still married, she would inherit from his estate. Fifteen days before Clyde was shot and killed by appellant, she purchased a .38 caliber handgun and two boxes of ammunition. The day of Clyde Griffin's death, she telephoned him at the ranch where he was staying. She and Mr. Kellogg then went to the ranch, taking the gun and the ammunition with them. She had never fired the gun before. At the ranch she fired the gun for the first time engaging in target practice. A few hours later, while seated on her sofa, in a drunken condition, she picked up her handgun and, as in target practice, fired a shot into the center of Clyde Griffin's chest, killing him almost instantly. There was considerable evidence of premeditation and malice necessary for a conviction of first-degree murder.

Appellant was convicted of manslaughter, however, because of her drunken condition at the time of the killing. At her sentencing hearing her attorney conceded drunkenness was the cause, and so did her doctor who testified as follows:

"She has done something that is absolutely not acceptable in our society, and that's killed someone. For that there ought to be some punishment and the jury of her peers so agreed. What that

punishment should entail is difficult to assess. Carol does have a disease, and a disease led her to do what she did and, nonetheless the act was committed, a life was lost that can never be given back. It's done and gone forever, so there is absolutely no restitution that can be made, and so for that reason that's why I don't envy the judge in this situation. I think that whatever sentence is imposed, ought to be absolutely tied to alcoholic treatment."

The judge, in sentencing appellant to eight to ten years, stated:

"I also during the trial, of course, had an opportunity to observe you, listen to your testimony during that period of time and also here again this morning and I have the distinct feeling and impression that while you regret what happened, you more regret it because it got you in the mess you are in today and brought you before this court and that you somehow in your own mind feel the taking of Clyde Griffin's life, under the circumstances, was justified. It is not. It cannot be, and this Court is never going to tell the public or society that if you have a problem which is greater than yourself the way to solve it is to pick up a gun and shoot someone else.

"You had ample opportunity prior to the time of the shooting to solve that problem by other means and other sources and you took no steps whatsoever as far as this Court's concerned to avoid the eventuality that occurred when Clyde Griffin died."

Twelve citizens in Big Horn County sitting on this jury heard all of the testimony, observed all of the witnesses, their manner of testifying, the inflection in their voices, their appearance, and assessed their credibility and truthfulness and found appellant guilty of manslaughter.

The dissent[1] would have us believe that an appellate judge, having heard not one

---

1. This is not a fact-sensitive case, but one in which the facts were in dispute. The disputed facts were resolved by the jury. The majority opinion, as first circulated, was an unemotional, dispassionate, non-inflammatory statement of facts with law application. Following an emotional dissent founded upon nonexistent wife abuse and attacking the character of decedent, a

bit of testimony from a live witness, never having observed the expression and demeanor of a single witness on the stand, and having had no opportunity to judge credibility, is in a better position, from the cold written word in a transcript of testimony, to ascertain who is truthful and who is lying, who is a perjurer, and to resolve disputed questions of fact. It is not the function of an appellate court to retry cases upon their facts. Twelve jurors believed appellant was guilty of manslaughter. The trial judge believed appellant was guilty of manslaughter. He denied a motion for judgment of acquittal and sentenced her upon conviction.

■ When viewed in a light most favorable to the State, the jury could have reasonably concluded that appellant was guilty of voluntary manslaughter. Appellant relies in part on the *Eagan* rule to advance her contention that the killing was justified by reason of self-defense. The *Eagan* rule states:

> "Where an accused is the sole witness of a transaction charged as a crime, * * * his testimony cannot be arbitrarily rejected, and if credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted." *Eagan v. State,* 58 Wyo. 167, 128 P.2d 215, 226 (1942).

revision of the majority opinion was necessary. Justice Urbigkit objects to revision of majority opinions as "constructionally unproductive." Justice Macy, in support of Justice Urbigkit, does not "condone replying to a dissent." I am disappointed. Response to a dissent is neither novel nor new in the law, see *Nollan v. California Coastal Commission,* — U.S. —, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and B.E. Whitkin's Manual on Appellate Court Opinions (1977).

(a) Except for addition of this footnote to the footnote above, the majority opinion was unchanged after the revised dissent. Now we are responding to footnotes. Suffice to say that the jury had before it everything to which the dissent alludes and concluded this was not technically wife abuse as would constitute a defense and as described in the literature. I continue to insist that the evidence was conflicting—thus the sheriff's incident report of September 23, 1984, states:

Appellant was the only witness to the shooting, but other people witnessed the events leading up to the shooting. Buck testified that the deceased was calm when he entered the trailer. Kellogg testified that the deceased reacted with a fearful statement after appellant fired the first shot. Expert testimony and evidence showed that the deceased was struck from a weapon fired from a distance of more than five feet. There was substantial evidence to support the jury's rejection of the self-defense claim and substantial evidence to support its finding.

## APPELLANT'S REQUEST FOR ATTORNEY AND SUBSEQUENT STATEMENTS

Appellant contends that her rights under the Fifth Amendment to the United States Constitution and Art. I, § 11 of the Wyoming Constitution[2] were violated because the Lovell police officer testified about the statements she made to him concerning the killing. The dissent suggests that the police officers in this small rural town lied, cheated, and took advantage of appellant when it states: "[H]e [the police officer] never intended to honor her initial request for counsel * * *"; that a police officer and appellant were sitting together in a room for "an undisclosed time for an undisclosed purpose [and t]hen, almost by magic, after something is said that is deemed in-

> "Carol then began bad mouthing his parents and the Mormon church which upset Clyde. He then advised that Carol jumped up and came at him and grabbed him[;] he advised that at this point he pushed her away and she hit the corner of the couch * * *.
> "At the time I spoke with Clyde he was not drunk * * *. Clyde advised that he thought the trouble in the marriage was his and her drinking and advised that he had tried to get help on this but he ended up going for counseling but that she would not."

2. The Fifth Amendment to the United States Constitution provides in pertinent part:
> "No person shall be * * * compelled in any criminal case to be a witness against himself * * *."
> Article 1, § 11 of the Wyoming Constitution provides in pertinent part:
> "No person shall be compelled to testify against himself in any criminal case * * *."

criminatory, the attendant officer leaves the room to draft his notes * * *"; this was "[c]learly, a deliberate elicitation plan * * * portrayed in the events, including factors of time, place, circumstance, and prompted response * * *."

■ The statements by appellant were not the result of interrogation, compulsion, overreacting, or anything else. They were nothing more than the ramblings of a drunken woman. But, if it were otherwise, it is absurd to suggest that the statements made by appellant while sitting in a room, guarded by a police officer, awaiting transportation to Lovell, made any difference in the outcome of this case. The statements by appellant were as follows, Officer Irwin testifying: "[A]nd then she says, it was premeditated, I was tired of him beating me up"; then she said, "should I lie and tell them somebody else shot him? I told her she probably shouldn't make any more statements until she talked to an attorney." And then she said: "[H]e attacked me." Later, on redirect examination concerning the statement, should I lie and say someone else did it, Officer Irwin was asked:

"Was it your impression after listening to her and observing her demeanor that this was genuine?

"A. No, it wasn't.

"Q. Why do you say that?

"A. All of her tone of voice, the way she said it, like it was—it's hard to explain. Like it was kind of a joke or said facetiously. I don't know how to explain it."

The jury knew appellant had killed Clyde Griffin. Kellogg saw her fire the first shot, heard the second shot, returned to the trailer where there was only appellant with her smoking gun and Clyde Griffin slumped against the wall, dead. Appellant called the dispatcher at the police station and told them she had shot Clyde Griffin. Finally, she testified at the trial as follows:

"First of all, I guess you are not denying that he is dead?

"A. I am not denying that.

"Q. You are denying that you shot him?

"A. I am not denying that.

"Q. And you are also not denying that he is not here to rebut or counter anything you have said?

"A. That's true."

The jury obviously did not believe the killing was premeditated when it refused to find her guilty of first-degree murder but found her guilty only of the lesser-included offense of manslaughter. To suggest that these few innocuous statements made any difference in the outcome of this case is pure fantasy, having no rational basis. The statements were voluntary, concerned matters admitted by appellant or were disregarded by the jury in convicting her of manslaughter.

■ This court is committed to the protection of those rights guaranteed by the Fifth Amendment and the requirement that an accused be advised of those rights, including right to counsel as stated by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Best v. State*, Wyo., 736 P.2d 739, 742 (1987). The purpose behind the *Miranda* decision is to prevent government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. *Arizona v. Mauro*, —— U.S. ——, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987). Once an accused has expressed his desire to deal with police only through counsel, he is not subject to further interrogation until counsel is made available, unless the accused initiates further communication, exchanges or conversations with the police. *Arizona v. Mauro*, supra, 107 S.Ct. at 1934; *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Absent interrogation, no infringement of such rights occurs. *Edwards v. Arizona*, supra, 451 U.S. at 486, 101 S.Ct. at 1885. Interrogation reflects a measure of compulsion above and beyond that inherent in custody itself. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The definition of interrogation includes only words or actions by police officers that they should have known were reasonably likely to elicit an incriminating

response. *Rhode Island v. Innis*, supra, 446 U.S. at 302, 100 S.Ct. at 1690.

In the instant case, no interrogation took place. Appellant was being held in Lovell in a room with a police officer only until transportation to the Big Horn County jail could be provided. The place at which this killing occurred is a rural, sparsely populated area having limited numbers of law enforcement personnel. The police officer having custody of appellant had no reason to suspect that she would make incriminating statements.

■ Appellant also contends her statements were involuntary because she was intoxicated. A statement that is not the product of interrogation or compulsion attributable to authorities or some other improper action, is voluntary and admissible. See 23 C.J.S. Criminal Law § 817 (1961). Apparently, appellant here contends the statement was the product of compulsion resulting from the existing circumstances. We question the efficacy of that contention, but nevertheless respond to the claim. Although tests showed appellant's blood alcohol percentage to be high, testimony at trial effectively rebutted any presumption that she was intoxicated. Two law enforcement officers noticed no signs of intoxication, and expert testimony at the trial indicated that a heavy drinker (as appellant) can function normally even with a high blood alcohol percentage. There was no factor other than the use of alcohol that would support a claim that the statement volunteered by appellant was involuntary. In *Mayer v. State*, Wyo., 618 P.2d 127, 128 (1980), the defendant was interrogated by police and made a statement which he later sought to have suppressed because he

> "was seventeen years of age, intoxicated, was suffering from physical injuries incurred from a severe beating, was emotionally overwrought and had been deprived of the counsel of his mother."

We affirmed the trial court's finding that the statement was voluntary, stating:

> "An examination of the cases cited by appellant in support of his argument reflects the circumstances in each are far more aggravated and severe than those

in this case. The trial court relied upon the factual situation as presented to it by the evidence, and it considered the totality of the circumstances surrounding the transaction. Such evidence as gauged against such standard supports the findings of the trial court." 618 P.2d at 130.

■ Clearly, the circumstances here were not as aggravated as in any of the cases cited in *Mayer v. State*, supra. The evidence before the court supports the conclusion that the statement was voluntary. There was no error in its admission.

### VOIR DIRE

During voir dire, appellant's attorney questioned juror Creech concerning self-defense:

> "MR. SPERRY: * * * Suppose that the Court gave you an instruction relating to self defense and it said in essence that an attack which appeared to a reasonable person to threaten serious bodily harm to that person might under certain circumstances that the Court would outline, authorize the use of deadly force or the necessary force to repel that threatened injury, that is, to serious bodily harm not just death to the defender. How do you feel about that, Mr. Creech? Could you abide by that Court instruction or would it put a little more burden on the defendant?
>
> "JUROR CREECH: That's a hard question to answer. I would have to use my own feelings regardless of what I was told.
>
> "MR. SPERRY: And, of course, you have told us here, Mr. Creech, haven't you, that you feel that force, deadly force with a weapon, should be used only when the life is threatened; right?
>
> "JUROR CREECH: Right.
>
> "MR. SPERRY: Are you telling us then if the Court instructs you that self defense comes into play and is an effective defense for the defendant in this action, even if only serious bodily harm is threatened, that you would have a problem obeying that instruction of the Court?
>
> "JUROR CREECH: Yes. I think so.

"MR. SPERRY: Well, Your Honor, I would ask to excuse Mr. Creech.

"THE COURT: Mr. Creech, you don't have that option. You have to follow what the Court gives you. The Court gives you the law of the case as it exists in the State of Wyoming and has been developed and handed down from the English Court. I don't have it. If the Supreme Court says to me, jump over the Bench, I have to jump over the Bench. You are in the same position. Does that change your opinion?

"JUROR CREECH: I still think I would have to give it a lot of thought on my own.

"THE COURT: I think Mr. Sperry, what you are getting into is an area we can't determine. If what you heard during the trial fits what the Court gives you that is the jury's instruction.

"I don't think that's a proper challenge for cause. I don't think Mr. Creech has said he is going to ignore the Court and become sole unto himself as the Judge and jury in this case, and you are also giving him a hypothetical which may not occur which we wouldn't know until we get all the evidence just exactly what instructions the Court will give.

"Therefore, voir dire on the instruction at this time is not a proper method, and I know and I will explain this to the jury that both counsel in the case have a fairly accurate idea of what they are going to produce before you, but trials take funny turns, not everything that the attorney thinks he will present to you always happens.

"I think we are premature at this time."

Mr. Sperry then resumed voir dire by questioning a different prospective juror on another area of self-defense.

■ The purpose of voir dire is to inquire of the prospective jurors as to their prejudices and biases which would interfere with their ability to decide the case fairly. *Hopkinson v. State*, Wyo., 632 P.2d 79, 111 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). In voir dire examination, counsel shall not instruct the jury on the law or argue the case. Rule 701(d)(4), Uniform Rules for the District Courts of the State of Wyoming. The impartiality of the jurors is a question of fact to be determined by the trial court upon the basis of proper questioning. *Jahnke v. State*, Wyo., 682 P.2d 991, 1000 (1984). Deference is afforded to the trial court in determining the permissible bounds of voir dire examination. *Summers v. State*, Wyo., 725 P.2d 1033, 1039 (1986).

■ By focusing on one aspect of self-defense, appellant's attorney in the instant case sought, through voir dire, to argue his case. The attorney's questions did not give the juror a complete statement of law, only a part of the law taken out of context.[3] The trial court could not, in this circumstance, decide whether a challenge for cause should be granted. The trial court properly held the challenge for cause premature. Appellant could have inquired further of possible bias or prejudice with respect to self-defense without reference to instructions or law. This approach would be preferable and more likely to develop information useful in exercising challenges for cause or peremptory challenges. Appellant chose not to interrogate juror Creech further. There was no error in voir dire.

## JURY INSTRUCTIONS

Appellant's proffered instruction F reads:

"One who has reasonable grounds to believe that another will attack her, and that the anticipated attack will be of such a character as to endanger her life or

---

**3.** The common-law requirements for self defense are:

"(1) [T]hat the slayer was not at fault in bringing on the difficulty; (2) that he believed, at the time of the killing, that he was in such immediate danger of losing his own life, or of receiving serious bodily injury, as made it necessary to take the life of his assail-ant; (3) that the circumstances were such to warrant reasonable grounds for such belief in the mind of a reasonable man; (4) that there was no other reasonable method of escaping or otherwise resolving the conflict." *Patterson v. State*, Wyo., 682 P.2d 1049, 1053 (1984), quoted in *Best v. State*, Wyo., 736 P.2d 739, 746 (1987).

limb, or to cause her serious bodily harm, has a right to arm herself for the purpose of resisting such attack.

"If the defendant armed herself in reasonable anticipation of such an attack, that fact alone does not make the defendant the aggressor or deprive the defendant of the right to self-defense."

The trial court refused this instruction because it felt the first paragraph had no pertinence to the case and other instructions covered the information presented in the second paragraph. The court also noted that appellant's attorney was unable to present any authority stating the proposition presented as law.

If an offered instruction is sufficient to apprise the court of the defendant's theory of the case, that theory still must be supported by competent evidence. *Best v. State*, supra, 736 P.2d at 744. The defendant's own testimony indicated that she purchased the gun to protect herself from the person making the telephone calls; and although she initially suspected the deceased of making these calls, her suspicions soon focused on another person. She did not purchase the gun because she believed Clyde would attack her; she was not armed for that reason. On the contrary, she, having no fear of Clyde, had invited him to move back to her trailer. There was no evidence to support the giving of that part of the instruction.

If part of an instruction is erroneous, a trial court may properly reject the entire instruction. *Evans v. State*, Wyo., 655 P.2d 1214, 1218 (1982). A trial court may refuse a proposed instruction if the principle embodied in the requested instruction is covered by other instructions. *Summers v. State*, supra, 725 P.2d at 1044;

*Britton v. State*, Wyo., 643 P.2d 935, 938 (1982). Because the first part of the instruction was erroneous, the trial court could have refused the entire instruction on that ground alone. However, the trial court found the second part redundant. Instructions 27, 28, 30 and 31 adequately covered the law of self-defense. Thus, the court properly refused both paragraphs of the proffered instruction.

Affirmed.

THOMAS and MACY, JJ., filed separate specially concurring opinions.

URBIGKIT, J., filed a dissenting opinion.

THOMAS, Justice, specially concurring.

I agree with the result reached in the majority opinion and much of the reasoning there set forth. I cannot join in that opinion.

With respect to Instruction F, relating to the right of the defendant to arm herself, in my judgment, that question is disposed of as a matter of law in *Brown v. State*, 80 Wyo. 12, 336 P.2d 794 (1959), cited with approval in *Summers v. State*, Wyo., 725 P.2d 1033 (1986). Clearly, no error occurred in this regard.

MACY, Justice, specially concurring.

I concur in the results reached in this case but do not condone the practice of replying to a dissent in a majority opinion.

URBIGKIT, Justice, dissenting.

I respectfully dissent from the decision of this court. In terms of the appellate process, this is a fact-sensitive case [1] when

---

1. In the pejorative attack on the character of defendant by rewritten majority opinion, one could discern the direction used to attempt essentially to eviscerate the adjudicative validity of the dissenting opinion. This writer remains persuaded that rewriting majority opinions in response to dissents is constructionally unproductive. Consequently, the dissent will not be rewritten to respond to the conclusory characterizations which intertwine legal analysis in present majority dissertation. Temptation, albeit fortuitously suppressed, exists to attach the original opinion by footnote or appendices so that communicative validity in the course of dialog could be preserved. However, nothing we now do, in rational assessment that none of the participants were angelic and that defendant acted rather predictably to the uncontrolled bad-temper conduct of decedent, as now followed by critique of the adequacy of process and representation, to be emotionally weighed by juristic fact conflict, will afford future precedential domination in legal rules and standards to be derived from this tragic episode.

related to Art. 1, §§ 10 and 11, of the Wyoming Constitution[2] and the Fifth, Sixth and Eleventh Amendments to the United States Constitution.

The deputy sheriff, after arriving at the Cowley homicide site, arrested appellant and took her the approximate five miles to Lovell by car. Prior to that time, appellant had been consuming alcoholic beverages intermittently for over a 12–hour period, and when tested some more than two hours later, still had a .23 percent blood-alcohol content.

On that short drive, the following occurred as related by the deputy sheriff:

"Q. Now then, after you got Mrs. Griffin down to the Big Horn County Sher-

iff's Office, what, if anything, took place there?

"A. On the drive from Cowley to Lovell she advised that she would like to speak to an attorney.

"Q. Okay.

"A. I told her once we get to Lovell and got things started squaring away, I would let her speak to one."

Then, in Lovell, for a time clearly in excess of an hour and in the late morning without making any effort to afford her the right to the requested attorney, the arresting officer first gave the accused her *Miranda* rights,[3] and then turned her over to police officer Lewis to "sit with her" while he "conducted another interview."

---

I would only conclude, after the editing process of the court's opinion now achieved, that the court's contention of nonexistent wife abuse is not sustainable from the police-call records, evidenced physical injury to defendant, written separation agreements, or the entire trial transcript as evidencing a course of wife abuse which was a substantial feature of defense. Confirming these established facts were the two separation agreements, one of May, 1985, and the second of July, 1985, as somewhat restated in the second edition, providing:

"2. That HUSBAND agrees not to contact, harass, or interfere with WIFE in any manner until he has obtained psychological counseling and until such time as the treating psychologist states that HUSBAND'S *emotional state is substantially more stable than now and is of no harm to WIFE. HUSBAND agrees not to verbally or physically threaten WIFE.*" (Emphasis added.) Agreement signed May 14, 1985.

Not choosing to rewrite this dissent in further factual response, I leave this case to litigants in rehearing request for argument about the facts, or to legal scholars for historical analysis. A fair current example is found in Johann and Osanka, *"I Didn't Mean to Kill Him",* Barrister (Fall 1987) at 18:

"Women *are* abused by spouses. Women *do* kill their men. And lawyers must defend them, and must understand society and today's criminal justice system,"

and I would add: within which scenario appellate courts and their individual members are only participatory functionaries.

2. "Right of accused to defend.

"In all criminal prosecutions the accused shall have the right to defend in person and by counsel, * * *." Article 1, § 10, Wyoming Constitution.

"Self-incrimination; jeopardy.

"No person shall be compelled to testify against himself in any criminal case, * * *." Article 1, § 11, Wyoming Constitution.

3. The *Miranda* form used contained the following information:

"LOVELL POLICE DEPARTMENT
"Lovell, Wyo.
"YOUR RIGHTS
"PLACE Lovell, Wyoming
"DATE 1–26–86
"TIME 11:24 A.M.
"*Before we ask you any questions, you must understand your rights.*
"You have the right to remain silent.
"Anything you say may be used against you in court.
"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
"If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
"If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time.
"You also have the right to stop answering at any time until you talk to a lawyer.
"WAIVER OF RIGHTS
"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. *I do not want a lawyer at this time. I understand and know what I am doing.* No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
"Detaining Officer:....
  Signed: /s/ Carol Griffin
"Witness # 1: /s/ Thomas Irwin
  Time: 11:27 A.M. Date Jan. 26, 1986
"Witness # 2:....
  Address P.O. Box 733
  Cowley, WY 82420" (Emphasis added.)

So Carol Griffin sat there for an hour with the officer watching her while she waited to be given the opportunity to see an attorney and the arresting officer waited to take her from Lovell to the county seat, Basin, approximately 36 miles further away.[4]

The officer testified:

"Q. You knew she was about to make some incriminating or what you thought to be incriminating statements, didn't you?

"A. I did not know that.

"Q. You didn't know what she—she was going to, after she started them, did you know the general train of the conversation that would be there?

"A. Not until she actually spoke the words.

"Q. Did you ever tell her maybe she ought to consult her lawyer?

"A. Yes, I did.

"Q. When did you do that throughout the statement?

"A. She asked if she could call her attorney. I told her that when Officer Lewis came back he would have made arrangements for her to call and then she said, do you think I should lie and tell them somebody else shot him? I said, maybe you shouldn't make any more statements until you talk to your attorney.

"Q. At that juncture that was the end of it?

"A. Yes. Sergeant Lewis came out and I told him that she had been making some statements. He told me to write them down and I did.

"Q. Did you write them down as they were made after that time after Sergeant Lewis came in?

"A. That was when I went and wrote them down, at that time.

"Q. After Sergeant Lewis came in?

"A. Yes."

At trial, appropriately refreshed by reading his notes, the officer further testified:

"Q. I am going to hand you a document, Officer, and ask if you can recognize that?

"A. Okay.

"Q. What is that document you just referred to?

"A. This is my written statement that I made that day.

"Q. That was the statement that you made that day?

"A. Yes.

"Q. After the part where she asked you if you hunted, do you recall what she said next?

"A. Well, I was mistaken in the sequence. She says, I have never even killed a deer before, and she asked me if I ever killed anybody and I said, no, and then she asked me if I ever went hunting and I said, yes, and then she says, it was premeditated, I was tired of him beating me up.

\*   \*   \*   \*   \*   \*

"Q. That's when you told her that Officer Lewis would see that she got to call her attorney?

"A. Yes.

"Q. What happened from that point?

"A. Well, then I told her that she—that's when she said, should I lie and tell them somebody else shot him? I told her she probably shouldn't make any more statements until she talked to her attorney.

"Q. Was there anything further said by her?

"Q. She said, Oh, and then said, he attacked me, and Officer Lewis walked out of the room and I walked out and wrote my statement."

Not so surprisingly, right after the incriminating statement was made, the original officer reappeared to make arrangements and take Mrs. Griffin to Basin, where sometime later that day she was

---

**4.** The attorney who had represented Mrs. Griffin in the litigative involvements of the marital problems with decedent was Kenneth Koski from Powell, with an office in Lovell, and the attorney who had represented decedent was L.R. Garrett, from Lovell. Consequently, no benefit was served in leaving Lovell to go to Basin in order to contact counsel.

first permitted to contact an attorney.[5] The confused state of the accused is clearly demonstrated by the factually unsustainable, shock-induced, alcoholic-related confinement statement in saying that "it [the offense] was premeditated, I was tired of him beating me up." To the contrary, the undisputed trial evidence, lacking conflict or contrary implication, proved that the decedent "busted" into her residence and verbally accosted her and the visiting friend with demonstrable intent to commit physical violence of the character which had permeated their short and violently disturbed marital relationship, including a large number of incidents of her physical abuse by him. The record portrays neither semblance of premeditation nor justification for any portion of the death-resulting conduct, except in the nature of a temper-induced, uncontrolled willingness to effectively put himself in a condition of, paradoxically, committing suicide by inviting what somewhat expectedly then happened.

However, prosecuting counsel then said in closing argument:

"You have already been instructed that whoever kills another human being purposely and with premeditated malice commits first degree murder. What's the evidence show about that? You remember Tom Irwin, the Lovell police officer who testified about last Wednesday and what he testified to, his report's in evidence. That report says while watching Carol Griffin in Sergeant Nick Lew-

is's office she was talking about the incident. I did not ask any questions of her. She said, I have never even killed a deer before, have you ever killed anybody, no, it was premeditated, I was tired of him beating on me, do you go hunting, yes, Mom just had a stroke, I don't know how she is going to take it, his Mom, I don't know what I am going to do with Mom and Dad. Mom is eighty-eight and Dad is ninety-one I just killed their son. He looked awful. Can I call my attorneys. Do you think that I should lie and say somebody else shot him? Until you talk to your attorney maybe you shouldn't say anything. Okay. He attacked me. "Why does that statement have the ring of truth? Let's go through some of these things that happened at the trial. "We do know that on January 26, 1986, about 10:30 a.m. Clyde Griffin was shot and killed in his residence at Cowley, Wyoming."

Recognizing that some literary license in prosecutorial closing argument is justified, the pervasive inaccuracy of *whose house* was the site of death is also inexplicable, since the death did not occur at his residence nor at a place where he had any defined right of return except upon invitation, which had not then been given. Characteristic of this record is that decedent, who had weighed 350 pounds before his stomach was stapled, was a man of about 240 pounds at death, and the physically abused defendant was about 93 pounds.[6]

5. It belies the power of contemplation why an arresting officer in a murder case in Lovell would leave the individual to whom he had promised a right to call an attorney so that he could "interview another witness" in an apparent disassociated situation. Unfortunately, this record does not define, through either sharply directed motion in limine or suppression proceedings by detailed cross-examination, information which could possibly dispel the obvious skepticism engendered from this appeal record.

It is particularly curious that having asked for an attorney on the way to Lovell and then being detained on an apparent subterfuge, the *Miranda* warning was first given and then the arresting officer left the room to pursue the other duties for the next hour. The only possible purpose of the *Miranda* warning was to initiate and validate what happened—a conver-

sation which might contain incriminating content.

It is also curious that the two officers were unable to observe any particular alcoholic influence or shock-related mental disturbance, even though some two hours later Mrs. Griffin still registered a blood-alcohol content of .23 percent.

6. In May, 1985, the parties admitted the domestic intranquility. Agreement was made wherein it was recognized that they were not living together, and for a 60–day period the husband agreed not to "contact, harass, or interfere with WIFE" or "to verbally or physically threaten WIFE." Events seemed to have improved during that period. When the agreement ended, the problems restarted, and a similar agreement was entered into July 24, 1985, for an additional 90 days. After expiration of that period, the

Presented relevantly as the issue to be addressed, Mrs. Griffin was defined to the jury as having asked for an attorney twice and having made an incriminating statement that she might lie and had committed the offense with premeditation.

Appellant accurately characterizes the essential transaction:

"Since Appellant made an *un* equivocal request for counsel, the only question is whether the suspect reinitiated contact with the police following the request."

The testimony of Sergeant Lewis offers no basis for concluding that the *Miranda* warning occurred because appellant reinitiated contact with the police. The time sequences were to the contrary. In fact, the officer's testimony indicates that he never intended to honor her initial request for counsel by arrangements to be made at Lovell, although his response to her request was, "I told her once we get to Lovell and got things started squaring away, I would let her speak to [an attorney]." Apparently the squaring away was providing the *Miranda* warning and getting a statement. See *Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). It is not surprising that when appellant took the witness stand she testified that she had no recollection of making the statements upon which her trial objection to introduction was premised, as she testified that her first knowledge of the contended statements came in trial preparation by reading the police officer's notes.[7]

This court justifies introduction of the incriminatory information by citation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, reh. denied sub nom. *California v. Stewart,* 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966); *Arizona v. Mauro,* —— U.S. ——, 107 S.Ct. 1931, 95 L.Ed.2d 458, reh. denied —— U.S. ——, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, reh. denied 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); and the Wyoming cases of *Best v. State,* Wyo., 736 P.2d 739 (1987); and *Mayer v. State,* Wyo., 618 P.2d 127 (1980).

It is my conclusion that this court is wrong in that neither under appropriate precedent defining the United States Constitution nor under the criteria of the Wyoming Constitution should the incriminatory material have been admissible if rights to counsel and against self-incrimination are to be maintained as constitutionally justified protection for the accused individual. Cf. Erickson, *The Unfulfilled Promise of Miranda v. Arizona Symposium,* 24 Am. Crim.L.Rev. 291 (1986). It is possible that with a fair trial, even in this jurisdiction, the defendant might have been similarly convicted, although the probabilities are singularly unpersuasive either for Big Horn County or anywhere else in Wyoming.[8]

---

problems recommenced in full fury until the separation on December 22, 1985 which would have ended on January 27, 1986 by the return of decedent to the trailer house owned by Mrs. Griffin, except that one day earlier, when he barged into the residential unit, his return was untimely ended. On January 9, 1986, he had written a painstakingly detailed request to be permitted to return and resume the marital relationship. Unquestionably he was a man of uncontrolled urges and violence in the classical mode of the physically abusive and wife-injuring husband. The case is also classic in the finally-too-much standard of the abused-wife homicide case, except here the husband was not in a mutually occupied residence when killed, and consequently the break-in and terrorizing attribute was added to the only too-frequently displayed societal panorama.

7. The series of events would be as clearly paraphrased in her intent in the statement, "I am not going to be beat up again. Stop or I will shoot you." He did not; she did.

8. Factually, we have a big male bully bursting into the residence of the separated, small wife, knowing she had been drinking and that she had recently purchased a firearm with which she was not familiar. A medal for the resulting disaster may not be appropriate, but neither was penitentiary confinement of the attacked and defensive female. Negligently, intentionally, or in pursuit of uncontrolled temper, the decedent suicidally approached. Whether fairly defined or not, decedent asked for what he got, and other bullyboys and woman-beaters, should be forewarned. The converse of this is found in *Ramirez v. State,* Wyo., 739 P.2d 1214 (1987), where the female was not killed, and the male

It is apparent that Wyoming precedent in *Cheatham v. State*, Wyo., 719 P.2d 612 (1986); *Daniel v. State*, Wyo., 644 P.2d 172 (1982); and *Best v. State*, supra, has no application since these cases consider the question of equivocal requests for counsel, which question does not apply to this case involving a request for counsel which was clear, unequivocal, absolute and immediate. Unfortunately, by any question asked or an answer given, the record in this case does not reflect why the arresting officer did not comply with his agreement to afford an opportunity to get an attorney in Lovell.

It is recognized that the test of admissibility of a confession as enunciated in *Mayer v. State*, supra, 618 P.2d at 128, "whether or not under the totality of the circumstances the waiver of constitutional rights and subsequent statements were given voluntarily, knowingly and intelligently," is applicable as effected by violation of an accused's right to counsel.

Defendant included in the motion in limine filed April 4, 1986:

"4. Any statements of Defendant purporting to be made to Officer Irwin, Officer Lewis, or other officers after her arrest and made at the Lovell Law Enforcement Center, or made after the time that she was taken into custody by the authorities, including specifically the memo purportedly written by Officer Irwin relating to statements voluntarily made by Defendant in his presence. This Motion is based upon the fact that Defendant was so under the influence of alcohol and mentally unbalanced at the time that the statements alleged to have been made are far more prejudicial than probative of any relevant facts herein under consideration."

No hearing on the motion was held prior to trial in the fairhearing mode as clearly contemplated by our precedent, *Hayes v. State*, Wyo., 599 P.2d 558 (1979), and by Rule 16, W.R.Cr.P. The procedure followed and rule announced in *Dodge v. State*, Wyo., 562 P.2d 303, 308 (1977) was unexplainably not followed here, where,

prior to trial, a hearing was held in which the defendant sought to suppress statements made by her to the police on the grounds that they were not voluntary:

"The trial judge followed the approved procedure in conducting a separate hearing out of the presence of the jury to determine the voluntariness of the statements. There must be a separate fair hearing and a reliable determination on the issue of voluntariness in front of the judge alone before the statements may be received in evidence at the trial for jury consideration."

A fair-hearing and reliability determination on the issue of voluntariness as a determination uninfluenced by the truth or falsity of the confession, is a standard unequivocally established in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964), and then clearly reaffirmed in the *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) decision. It is my conclusion that where the issue of voluntariness of a confession or other incriminatory statement is raised pursuant to Rule 16, W.R.Cr.P., at a time prior to trial, a hearing in the constitutional context required by *Jackson v. Denno*, supra, should be held also in advance of trial, so that counsel would know what the rules of the game would be in trial, and also so that the obviously pervasive effect of introduction, if subsequently permitted, will not permeate the atmosphere of the jury evaluation as derived from the recess for hearing otherwise required. *Dodge v. State*, supra. Attention is specifically directed to *Lufkins v. Solem*, 554 F.Supp. 988 (D.S.D.1983), aff'd 716 F.2d 532 (8th Cir.1983), cert. denied 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984), in both the procedural and ineffectiveness contexts.

A further problem is first raised in this case by appellant's brief discussing a trial defect not initially pursued at trial by specific objection or motion in limine. The prosecution was permitted to introduce into evidence defendant's request to see an at-

---

went to prison for a long term. Specific attention is also directed to *Cutbirth v. State*, Wyo.,

663 P.2d 888 (1983), where the abused wife was killed.

torney, to then be multiplied in trial harm by measured noncompliance until an incriminatory statement is obtained. It is recognized that specific objection to the admitted testimony of the request for an attorney was not made, and that the subject is consequently only here on a plain-error inquiry. The strategic finesse against comment on the privilege against self-incrimination is to present to the jury the testimony of the request for an attorney. Both are exceptionally prejudicial and similarly contravene the accused's constitutional rights. *State v. Rogers*, 32 Ohio St.3d 70, 512 N.E.2d 581 (1987).

This case presents an intoxicated individual without regard for the no-see, no-hear, no-explanation of the arresting and witnessing officers, a request for counsel promised and denied, and a strategy which may be related to a how-to book or seminar on interrogation, deliberately structured to elicit incriminating statements from the defendant in the absence of requested counsel. If this critique appears overblown, the factual events require reanalysis, including promise, process, denying opportunity to call from Lovell, unexplained delay in delivery to the county seat with two people, one a police officer and the second the person who has just been involved in a homicide, sitting together for an undisclosed time for an undisclosed purpose. Then, almost by magic, after something is said that was deemed incriminatory, the attendant officer leaves the room to draft his notes, while the other officer returns to the room and makes arrangements for transfer of the accused through car travel to the office in Basin. I would not find that the *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) notation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), affords a justification for admission by its differentiation from the fundamental principles defined in *Massiah* and *Henry*. Clearly, a deliberate elicitation plan is portrayed in the events, including factors of time, place, circumstance, and prompted response by *Miranda*-form utilization. *United States v. Henry*, supra. The test of *Rhode Island v. Innis*, supra, 446 U.S. at 300–301, 100 S.Ct. at 1689–1690, "a person in custody is subjected to either express questioning or its functional equivalent," is presented by rational application of the objective standard. The psychological pressure which was of concern to Justice Stevens dissenting in *Innis* is even more obviously portrayed here. Certainly this is not an *Arizona v. Mauro*, supra, case. Patton, *The Sixth Amendment Right to Counsel: Government Circumvention Through Surreptitious Interrogation*, 20 J.Mar.L.Rev. 567 (1987). See also *Brewer v. Wiliams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, reh. denied 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed. 2d 240 (1977); *Edwards v. Arizona*, supra, 451 U.S. 477, 101 S.Ct. 1880; *Rhode Island v. Innis*, supra, 446 U.S. 291, 100 S.Ct. 1682; Note, *Moran v. Burbine, The Decline of Defense Counsel's "Vital" Role in the Criminal Justice System*, 36 Cath.U.L. Rev. 253 (1986).

## VOIR DIRE

A fair and impartial jury is a firm constitutional command of the Wyoming Constitution, Art. 1, § 9 and the Sixth Amendment to the United States Constitution. Chief Justice John Marshall in 1807 established the fundamental standard for American adjudication:

"The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 Fed.Cas. 49, 50 [¶¶ 14,692–14,694] (1807).

See *Lee v. State*, Wyo., 743 P.2d 296 (1987); and *Summers v. State*, Wyo., 731 P.2d 558 (1987), Cardine, Justice dissenting, and Urbigkit, Justice dissenting.

The method provided by rule and statute for achievement of the constitutionally guaranteed liberty interest is an effective voir dire. All people are not equal when perceived and evaluated by basic prejudices, determined social values, and intrinsic attitudes. Expert trial attorneys and forensic psychologists conclude that in 90 percent of the cases, a jury trial is likely preordained at a time before the first witness is called to testify. The aim of the

protagonist advocate, and particularly so in criminal defense, is to lower the 90–10 relationship to afford a better opportunity for reason and fairness considerations.[9]

Although not in itself determinative in this case by virtue of an exercised peremptory challenge, as undeterminable from this record to have been provided by whichever party, the stark example is demonstrable. This case factually and forcefully demonstrates the long-time concern held by this writer about the constitutionality of Rule 701(d)(4), Uniform Rules for the District Courts of the State of Wyoming,[10] as applied in criminal cases, and its advocacy and propriety if misused in civil cases, whereby adequate inquiry is not afforded to properly exercise challenges for cause, or to knowledgeably utilize the rights to peremptory challenge. Neither the court nor counsel can determine the impartiality question unless an adequate voir-dire examination is authorized and pursued. Cf.

*Summers v. State,* Wyo., 725 P.2d 1033 (1986), aff'd 731 P.2d 558 (1987); *Jahnke v. State,* Wyo., 682 P.2d 991 (1984). See National Jury Project, Inc., Jurywork, Systematic Techniques, Ch. 2, Improving Voir Dire Conditions (2d ed. 1986).

To understand the scenario of this case, it must be noted that no complete list of witnesses to be used by the State was furnished; no pretrial conference was held; and no *Jackson v. Denno* hearing was provided in pretrial process. Subpoenas issued prior to the commencement of trial include a significant number of names, but obviously, in retrospect, not all the witnesses were called by the State to testify. Among the veniremen called for examination was Charles Scheeler, number 42.

In voir-dire examination of venireman Scheeler, we find:

"MR. THARP: You heard the Court just go over an explanation of the functions of the Court and jury. With what you

**9.** An exhaustive and specific analysis of this trial requirement is presented in an excellent treatise by the National Jury Project, Inc., Jurywork, Systematic Techniques (2d ed. 1986):

"Systematic jurywork is an overall approach to trial preparation for any jury trial. Two general premises underlie this approach.

"First, the trial team can and should concern itself with structural issues in the jury system and the jury selection process. Issues such as the procedures employed for conducting voir dire and empanelling juries, the manner in which peremptory challenges are used, and the extent to which jury pools are representative affect the fairness of an individual trial, and thus, every case that goes to trial.

"The second premise in this approach is that the conduct of an effective voir dire and the selection of a jury best suited to hear a particular case require that the perspectives jurors bring to the courtroom be integrated into the process of trial preparation for a case. If trial preparation includes careful examination of the witnesses, evidence, and jury instructions; concerted efforts to identify possible juror reactions to that material; and systematic analysis of the reasons that different jurors might react differently to the same evidence and argument, a case presentation can be developed that will be well received by jurors who have been carefully chosen for their ability to hear a particular case." Id., § 1.01 Introduction, at 1–1.

**10.** Rule 25, W.R.Cr.P. states in pertinent part: "(a) Examination of jurors.—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper." Rule 701, Uniform Rules for the District Courts of the State of Wyoming states:

"(a) The only purpose of voir dire is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

"(b) The court shall not permit counsel to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

"(c) The court may inquire of the prospective jurors.

"(d) In voir dire examination counsel shall not:

"(1) Ask questions of an individual juror that can be asked collectively;

"(2) Ask questions answered in a juror questionnaire except to explore some answer in greater depth;

"(3) Repeat a question asked and answered;

"(4) Instruct the jury on the law or argue the case;

"(5) Ask a juror what his verdict might be under any hypothetical.

"(e) The court may assume voir dire if counsel fails to follow this rule. If the court assumes the voir dire, it may permit counsel to submit questions in writing."

know about Clyde and his family, do you think you could be a fair juror, to be able to judge the case based on what comes from the witness stand?

\*       \*       \*       \*       \*       \*

"THE COURT: How about you, Mr. Scheeler, you indicated you knew Clyde Griffin or members of his family?

"JUROR SCHEELER: I knew them when I moved to Byron. I run a business up there. Run into them.

"MR. THARP: How long you lived in Byron?

"JUROR SCHEELER: Seven years.

"MR. THARP: Would what you know about Clyde or his family, would that cause you any problems sitting here as a juror?

"JUROR SCHEELER: I don't think so.

"MR. THARP: What about Carol Griffin, you know her?

"JUROR SCHEELER: Yes.

"MR. THARP: Would your acquaintance with her cause you any problems being a juror in this case?

"MR. SCHEELER: I don't think so."

After inquiry, the prosecuting attorney gave the names of a large number of potential witnesses, and inquired of the veniremen separately as to whether any association or acquaintanceship would adversely affect their fairness that "would cause you any problems being a juror." After these names had been separately listed in considerable detail, the following occurred:

"THE COURT: Gone through all your witnesses?

"MR. THARP: I think pretty much.[11]

"MR. SPERRY: Covered the waterfront, Your Honor."

It was established that Scheeler had been a military policeman in the Korean War; he didn't know what circumstance might "necessitate the taking of human life," and thought that drunkenness should not be used as an excuse to commit a crime because "I don't think it should be used, I sell it."

Then, in answer to the inquiry of defendant:

"MR. SPERRY: Mr. Scheeler, you might well have heard some opinions expressed. You said you sold liquor; is that right?

"JUROR SCHEELER: I have that business.

"MR. SPERRY: I bet you have heard some opinions expressed, haven't you?

"JUROR SCHEELER: You hear all kinds of things in my place.

"MR. SPERRY: Well, have you ever expressed an opinion?

"JUROR SCHEELER: No. When I do, I do it in my own mind because I can't come out in the open. I got customers. I might lose a customer over it.

"MR. SPERRY: But you have formed in your own mind an opinion in this case, haven't you?

"JUROR SCHEELER: Well, I never did actually ever know what the truth really was. You hear so many different stories and different people come in there and I just listen to this and listen to that, might as well forget about it and get the real truth when it comes to Court.

"MR. SPERRY: You heard the Judge talking to you a minute ago about something relayed and several people hear it and pretty soon you can't really remember exactly. Do you think you would have any trouble if you would go to the jury room and sit there trying to help in deliberation separating out of your mind what you hear from this witness stand from what you have heard out there in the Byron Bar?

"JUROR SCHEELER: I don't think that would have any effect on me actually.

"MR. SPERRY: Are—you think you could be fair and impartial?

"JUROR SCHEELER: I believe I could, because you got to if you are going to have, get along with your customers without fights or anything in the bar, too, you got to work with them and keep the peace. You got to work both sides. I work with women and men both, but I hate to tell you which one is the worse.

---

11. See Bailey and Rothblatt, Successful Techniques for Criminal Trials, § 6:19 Compelling the prosecutor to disclose his witnesses, at 175 (2d ed. 1985).

"MR. SPERRY: We wouldn't get you into that."

Selection of the jury was completed on the day the trial commenced, April 28. On May 2, a subpoena for Carol Scheeler, who was obviously the wife of the prior venireman, was issued without any record reflection of notice of her name or anticipated testimony. Then, as she was called in rebuttal to testify, we find her testimony in regard to an incident in the bar operated by the Scheelers in Byron, involving the defendant and a Frank Fitzgerald who was clearly antagonistic to the decedent as a prior employer of the defendant and who had previously testified for defendant. This testimony came late in the evidentiary stage in the midst of the accusative "been eating oyster" testimony as hearsay relating Charles Kellogg to a friend of Mrs. Griffin. The entire scenario bespoke of the problems evidenced in *Schmunk v. State*, Wyo., 714 P.2d 724 (1986), and *Frias v. State*, Wyo., 722 P.2d 135 (1986). The elicited testimony was:

"BY MR. THARP:

"Q. Would you state your name, please?

"A. Carol Scheeler.

"Q. Where do you live, Mrs. Scheeler?

"A. Byron, Wyoming.

"Q. You work outside your home?

"A. Yes. My husband and I own the Byron Bar and Cafe.

"Q. How long have you run the Byron Bar?

"A. Six years.

"Q. Do you know Clyde Griffin or did you know Clyde Griffin?

"A. Yes.

"Q. How about Carol Griffin?

"A. Yes.

"Q. Do you know Frank Fitzgerald?

"A. He has been in a few times as a customer is the only way I know him.

"Q. You know who he is?

"A. Yes.

"Q. Do you recall when Clyde Griffin would have been in jail in Cody in November of 1985?

"A. Yes.

"Q. And do you know why he was there?

"A. I believe he had a DWI.

"Q. During that time do you recall Mrs. Griffin and Mr. Frank Fitzgerald being in your bar?

"A. Yes.

"Q. Do you remember what time of day this was?

"A. Oh, it was in about middle of the afternoon.

"Q. Were you personally present?

"A. Yes. I was working.

"Q. Were you tending bar?

"A. Yes.

"Q. What did they come in to the bar, you say, about the middle of the afternoon. Where did they sit in the bar?

"A. About the middle of the bar.

"Q. Did you see them?

"A. Yes.

"Q. Could you describe what they did while they were there?

"A. Well, I believe they said they had been to a sale and talking about something, about delivering a television and they had, I think, two drinks and they were giggling and Mr. Fitzgerald was playing with Mrs. Griffin's breasts.

"Q. Playing with Mrs. Griffin's breasts?

"A. Yes.

"Q. Describe what he was doing.

"A. Well, they were just sitting very close together and he was playing with her breasts and they were kissing.

"Q. Kissing in the bar?

"A. Yes.

"Q. You observed this?

"A. Yes.

"Q. How long did this go on?

"A. Oh, approximately twenty minutes.

"Q. And how long were they in the bar?

"A. Probably thirty minutes.

"Q. And have they ever been back in there together since?

"A. No.

"MR. THARP: I have I don't believe I have any further questions.

"MR. SPERRY: I have no questions, Your Honor.

"THE COURT: Beg your pardon? [An audio recording at this point for tone-of-voice perception would be most interesting.]

"MR. SPERRY: No questions.

"THE COURT: You may step down."

The record does not portray that counsel for defendant ever recognized what hit him, as initiated by inconclusive voir dire and the unlisted rebuttal witnesses. Obviously, the significance of these events would be much greater if Scheeler had stayed on the jury, even though we cannot tell whether the peremptory challenge which denied that result was by the State or the defendant. The point to be made in any confined voir-dire opportunity and obligation is, how many venirepersons of this character are not discovered and consequently not excused? Again, we have the same problem which existed in *Braley v. State*, Wyo., 741 P.2d 1061, 1070 (1987), Urbigkit, J., dissenting.

It is of the essence of this nation's criminal system that the trial by a jury of a defendant's peers include an essential ingredient of that right that the jury consist of impartial or indifferent jurors. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961). The necessity of a thorough voir-dire inquiry to identify bias is recognized in *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), and cases cited in n. 13 at 1038, 104 S.Ct. at 2892, including *In re National Broadcasting Co.*, 209 U.S.App.D.C. 354, 653 F.2d 609, 617 (D.C.Cir.1981); *United States v. Duncan*, 598 F.2d 839, 865 (4th Cir.), cert. denied 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed. 2d 96 (1979); *Calley v. Callaway*, 519 F.2d 184, n. 45 at 209 (5th Cir.1975), cert. denied sub nom. *Calley v. Hoffman*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). The Delaware Supreme Court, while recognizing that the practice favors limited voir dire, carefully reviewed the importance in constitutional terms by assessing before reversal "whether defendant was allowed to take adequate steps to make sure that he was tried by a fair and disinterested panel of jurors." *Hughes v. State*, Del. Supr., 490 A.2d 1034, 1041 (1985).

I categorically differ with the conclusion of this court that appropriate examination of the obvious areas of prejudice and antagonism cannot and should not be explored on voir dire. Perhaps the question was not as artfully composed as it might have been, but the subject of a singular issue of defense was perhaps a major responsibility of defending under the factual circumstances evidenced in this case. The whole field of the abused-wife syndrome, physical-violence proclivities, and retreat-to-the-wall criteria are inseparably invoked in the constitutional-fairness requirement of the individual juror.[12]

I would adopt the carefully stated and specifically applicable constitutional analysis in a current opinion of the Fifth Circuit Court of Appeals, *King v. Lynaugh*, 828 F.2d 257, 259 (5th Cir.1987):

"The right to an impartial jury is basic to our system of justice. This right carries with it the concomitant right to take reasonable steps designed to ensure that a jury is impartial. Perhaps the most important device to serve this end is the jury challenge, a device based on voir dire examination. Although the proper scope of voir dire is generally left to the sound discretion of the trial court, that discretion is not unfettered. Limits on voir dire that create an unreasonable risk of bias or prejudice infecting the trial process violate due process."

I would reverse for a proper, fair, and reasonable trial, with improper evidence excluded. It is not only possible, but highly likely, that upon retrial, a *Frias v. State*, supra, result would be achieved by second-proceeding jury acquittal.

---

12. The obvious problem on this record is that Creese also was not included among the final jury membership, although it may be, but is not, determinable that the peremptory-challenge removal was required of defendant, then causing appellant to retain another undesired member on the jury.