**Andrew J. JOHNSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 89–283.

Supreme Court of Wyoming.

March 4, 1991.

Rehearing Denied March 27, 1991.

Leonard D. Munker, State Public Defender, Steven E. Weerts, Sr. Asst. Public Defender, and David Lindsey, Asst. Public Defender, Public Defender Program, for appellant.

Joseph B. Meyer, Atty. Gen. and John W. Renneisen, Deputy Atty. Gen., for appellee.

Before URBIGKIT, C.J., MACY and GOLDEN, JJ., and RAPER and BROWN, Ret.JJ.

BROWN, Justice, Retired.

In a jury trial in the Laramie County District Court, appellant Andrew J. Johnson was convicted of aggravated burglary and first degree sexual assault. The jury also found him to be a habitual criminal.

Counsel for appellant raised five issues on appeal: [1]

---

**1.** Appellant filed a brief pro se and raised additional issues:

I. Should the trial judge have allowed the district attorney to use the habitual criminal under the provision of s. 6–10–201 et seq. W.S.1977, against the appellant when the District Court of the First Judicial District, did not advise the appellant of his constitutional right, either as a deprivation of due process of law or as a denial of equal protection of the laws?

II. It was reversible error for the trial judge to allo[w] the state to alter the photograph, to make an identification card appear in it.

I. Was the Appellant improperly denied his right to waive a trial by jury?

II. Was the suppression ruling of the trial judge proper?

III. Was it reversible error for the trial judge to exclude evidence of the victim's prior reports of sexual assault based on trial counsel's failure to comply with § 6–2–312 W.S.1977.

IV. Was it reversible error for the trial judge to allow the state to present witnesses which were not provided to the Defendant under the reciprocal discovery provision of Rule 16.1 W.R.Cr.P.?

V. Did the prosecutor impermissibly comment on the Defendant's right to be innocent until proven guilty?

The State of Wyoming states the issues to be:

I. Does the "Supplement Brief of Appellant" filed pro se raise any issues cognizable by this court?

II. Does a criminal defendant have an unqualified right to waive a trial by jury?

III. Was the trial court's denial of appellant's motion to suppress the identification of appellant's eyeglasses proper?

IV. Was the admission of appellant's identification of his eyeglasses harmful error, requiring reversal of appellant's convictions?

V. Did the trial judge properly exclude evidence of the victim's prior conversations of sexual assault?

VI. Did the trial judge properly allow the state to present witnesses previously noticed to the defendant, but not noticed to the defendant under the reciprocal discovery provision of Rule 16.1 W.R.Cr.P.?

VII. Did the prosecutor impermissibly comment on appellant's right to be silent until proven guilty?

We affirm.

In the evening of June 10, 1989, the victim was drinking in a bar with friends. Appellant Andrew J. Johnson, known as "A.J.," came into the bar. The victim had previously met A.J. through her boyfriend. The victim and A.J. talked about the latter's recent break-up with his girlfriend. They decided to check out a few well-known watering holes in Cheyenne.

The victim did not have identification to gain entrance into certain establishments, so she and A.J. drove to her house to look for her I.D. Upon arriving at her house, A.J. went to the living room, sat down in a chair and remained there while the victim looked for her I.D. She did not find it. Nevertheless, they went to the Cheyenne Club with assurances from A.J. that he could gain her admittance to the bar. From there they went to the Mayflower, where they were asked for identification. The victim remembers A.J. reaching into his back pocket and showing his identification card at the Mayflower. After leaving the Mayflower, the victim drove home, leaving A.J. at an unidentified building.

After reaching her house, the victim went to bed. She was awakened sometime later by a banging on her door, and a voice she recognized as A.J.'s. She heard the glass on the door break and footsteps move across the glass. The victim could see the intruder clearly and recognized him as appellant, Andrew J. Johnson. The victim jumped out of bed, pushed appellant and ran toward the bathroom. Appellant grabbed the victim's arms, twisted them behind her back, and threw her face down onto the floor and proceeded to ravish her. Appellant then turned the victim over onto her back and again raped her.

A downstairs neighbor heard the victim scream, dialed 911 and reported what she was hearing. Officer Alan W. Spencer responded to the 911 call. He noted the broken glass inside the apartment and supposed that someone standing outside the apartment must have broken the windows. Spencer heard crying, whimpering and

III. Did the forensic scientist crime laboratory give perjured testimony; prior to her written report?

IV. Did the district attorney use false evidence?

V. Did the district attorney make remarks before the jury that went beyond the evidence?

VI. Did police, detective, and victim give perjured testimony during the court hearings about my eye-glasses?

muffled yells coming from the apartment. The victim was sobbing and in a hysterical emotional state. Through her cries, the victim said, "He hurt me, he hurt me." Officer Spencer asked, "Who hurt you?" The victim responded that it was "A.J." who had hurt her.

Officer Spencer found appellant's identification on the floor of the victim's apartment. The identification packet was properly received into evidence as state's exhibit 13. State's exhibit 13 consisted, in part, of a Wyoming identification card and a Wyoming driver's license. Both items of identification show appellant wearing glasses, and the glasses worn in the identification appear identical to the glasses found at the victim's apartment. Spencer showed the identification to the victim and asked, "Is this the A.J. you're talking about?" The victim, upon looking at the picture, went into hysterics, but eventually responded, "Yes, that's A.J."

About two days after the rape, the victim found a pair of glasses in her bedroom. She thought the glasses must have belonged to appellant, so she called Detective Stanford of the Cheyenne Police Department. Appellant subsequently identified the glasses as his. The victim remembered appellant wearing his glasses at the bar after they had looked for her identification, and she testified at trial that she had never seen appellant without his glasses.

Appellant appeals from his jury conviction.

I

■ At his arraignment and again before trial, appellant requested that his case be tried before the court without a jury. The state did not consent to a nonjury trial. Because of the state's refusal to waive a jury trial, the court directed that the case be heard by a jury.

The waiver of right to a jury trial is controlled by W.R.Cr.P. 24(a). This rule provides:

Trial by jury.—Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the state.

This rule confers upon the defendant a "qualified" right to waive a jury trial. The right is qualified because waiver requires approval of the court and consent of the state. In Taylor v. State, 612 P.2d 851, 854 (Wyo.1980), 37 A.L.R.4th 304, 315 (1985), this court stated:

In other words, the rules implicitly acknowledge that the right to trial by jury is a constitutional right of the defendant, the waiver of which is qualified in the context that it may not be exercised without the approval of the court and the consent of the State.

■ An accused does not have a right to a trial to the court. In Singer v. United States, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630, 638 (1965), the Court pointed out that:

We find no constitutional impediment to conditioning a waiver of this right [the right to trial by jury] on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him.

Appellant contends that there is an exception to the general rule that the state must consent to a nonjury trial. In support of this contention he refers to Singer:

We need not determine in this case whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial. Petitioner argues that there might arise situations where "passion, prejudice ... public feeling" or some other factor may render impossible or unlikely an impartial trial by jury.

Singer, 380 U.S. at 37–38, 85 S.Ct. at 791 (footnote omitted).

Referring to the quotation from Singer, appellant states in his brief to the court:

This passage creates an exception to the generally accepted proposition that there

is no constitutional impediment to conditioning the Defendant's right to waive a jury trial upon the approval of the court and the consent of the state. The court points out that in certain cases trial to a jury would violate the Defendant's right to an impartial trial. This is exactly such a case.

This case involves an accused who is a black and an alleged sexual assault victim who is white. The crime is alleged to have occurred in Cheyenne, Wyoming, a community with a limited number of black persons. The number of blacks is so limited that not one black was impanelled on the jury venire, and obviously no blacks sat on the Appellant's jury. This situation is sufficient to implicate the Appellant's ability to receive a fair jury trial. However, additionally is the fact that the crime appellant was accused of is one of the type which tends to arouse the passions, prejudice and public feelings of any community. * * * Appellant had no chance of receiving an impartial jury trial.

■ While appellant phrases this issue as a denial of a right to a nonjury trial, his argument is that he was denied the right to an impartial jury. If the right to a fair and impartial jury is questioned, a motion for a change of venue is the proper recourse under W.R.Cr.P. 23(a). Appellant has presented no evidence, to either the trial court or this court, that would tend to show prejudice so great as to deprive him of an impartial jury. An accused is guaranteed the right to a trial by jury; he is not guaranteed the right to a nonjury trial. Trial by jury was not error. This conclusion is supported, almost without exception, by other jurisdictions which have a rule the same or very similar to Wyoming's. Annotation, *Right of Accused, in State Criminal Trial, to Insist, Over Prosecutor's or Court's Objection, on Trial by Court Without Jury*, 37 A.L.R.4th 304, 310–15 (1985).

## II

■ On Tuesday, June 13, 1989, Detective Stanford received a call over his police radio concerning additional evidence at the victim's house. He proceeded to the victim's house and was shown the glasses. On June 29, Detective Stanford was told that appellant wanted his glasses. In fact, from the time appellant was arrested on June 11, 1989, until June 29, 1989, he had made several requests for his glasses. The detention nurse at the county jail checked appellant's personal property for his glasses, but none were found. Appellant became angry and demanded his glasses. He stated that he knew Detective Stanford had them and threatened to sue the county for denying him medical care. Appellant told the detention nurse to call Detective Stanford, which she did. Stanford, after being summoned to the jail by appellant, brought the glasses to appellant. Detective Stanford asked appellant if the glasses were his. Appellant answered affirmatively. The glasses were not given to appellant but were preserved for evidence.

Before trial, appellant made a motion to suppress the inculpatory statements made by him to Detective Stanford regarding his ownership of the glasses. At the suppression hearing, Detective Stanford testified that he felt an identification of the glasses was important because it would place the defendant at the scene of the crime. He further testified that it was his intent to get an identification of the glasses when he went to the jail.

■ Appellant contends in his second issue that the statements made by him regarding ownership of the glasses should have been suppressed because his right to counsel under the Sixth Amendment of the United States Constitution was violated. The right to counsel attaches when adversarial criminal proceedings against the accused have been commenced. *Brown v. State*, 661 P.2d 1024, 1029 (Wyo.1983). "Once an accused has expressed his desire to deal with police only through counsel, he is not subject to further interrogation until counsel is made available, unless the accused initiates further communication, exchanges or conversations with the police." *Griffin v. State*, 749 P.2d 246, 253 (Wyo. 1988). *Griffin* defines "interrogation" as

"only words or actions by police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 253–54.

In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981), the Court held that an accused person in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." In the case here, appellant learned at the preliminary hearing that the police had his glasses, and he demanded their return and told the detention nurse to specifically call Detective Stanford. The trial court found that appellant initiated the further communication, exchange or conversation with the police, and denied suppression of his statement.

In *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1688–89, 64 L.Ed.2d 297, 306–07 (1980), the Supreme Court defined the term "interrogation" for constitutional purposes. The Court recognized that " '[i]nterrogation' * * * must reflect a measure of compulsion above and beyond that inherent in custody itself." The Court then defined interrogation as "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. The *Innis* court points out that the definition of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

Arguably, according to the *Innis* definition of interrogation, appellant cannot be said to have been interrogated by the police. He demanded his glasses, which he knew Detective Stanford had, then he demanded to speak with Detective Stanford. There is no evidence of coercion or compulsion. Appellant voluntarily gave whatever statements he made regarding his glasses; the police responded to the demands made by appellant.

In *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1936–37, 95 L.Ed.2d 458 (1987), the Court points out that the purpose behind the decisions in *Miranda* and *Edwards* is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."

The state argues that when appellant told the detention nurse that he knew the police had his glasses, he was voluntarily giving a statement in an unrestrained environment. The State argues further that the simple act of verifying that the glasses held by the police were the glasses appellant claimed were his cannot be said to amount to coercive interrogation. We would have no problem with the introduction of the glasses into evidence except that Officer Stanford admitted that he intended to have appellant identify the glasses in order to place him at the scene of the crime.

Whether the trial court improperly denied appellant's motion to suppress his statements to Officer Stanford is a close question. We will, for the purposes of this case, assume that denial of the motion was error. However, the state's evidence against appellant is so overwhelming that the error is harmless beyond a reasonable doubt.

The proper analysis to be employed in this case is that found in *Campbell v. State,* 589 P.2d 358 (Wyo.1979). There the court held that, "[b]efore a federal constitutional error can be held harmless, the burden is on the State to demonstrate and the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 367.

Appellant's claim of a sixth amendment violation is only his statement identifying his glasses, not the introduction of the glasses into evidence. Notwithstanding testimony relating to appellant's identification, the glasses could still have been introduced into evidence and the jury could have reasonably inferred from other evidence that they belonged to appellant.

To reiterate, during the trial, the victim testified that while she and appellant were out on the night of June 10, 1989, she remembered appellant taking off and wiping his glasses. The victim's boyfriend and appellant's friend also testified concerning the glasses. He stated that he did not wear glasses himself and had never seen appellant without his glasses. Officer Bilkie, who arrested appellant, testified that appellant was not wearing glasses when he was arrested, and he did not wear glasses to the station.

The appellant's defense was based upon the premise of mistaken identity. The evidence regarding the glasses is only one piece of evidence establishing identity. There is much more. The victim testified that she was at home in bed when a banging on her door woke her up with a voice saying "let me in." The victim testified that she recognized the voice as that of appellant. The victim testified that she recognized appellant as the person who raped her. The police found appellant's driver's license and state identification card at the scene of the crime. The state's expert witness conducted tests on the seminal fluid found in the victim. The state's expert was able to exclude 95 percent of the population. Appellant is among the five percent who could have left the seminal fluid. The evidence presented by the state identifying appellant as the perpetrator of the crime is overwhelming. There is no possibility that, in the absence of the error, the verdict would have been more favorable to appellant. *Campbell*, 589 P.2d at 367.

### III

■ Appellant attempted to introduce evidence at trial that the victim had falsely reported a previous sexual assault. The trial judge refused to allow this evidence based upon appellant's failure to file proper notice under the Wyoming Rape Shield Act, W.S. 6–2–312 (June 1988 Repl.).[2] Appellant contends, however, that the Rape Shield Act was inapplicable in this case. According to appellant, it was not the purpose of this line of questioning to smear the victim's credibility through introduction of her prior sexual activity. Rather, appellant contends he attempted to impeach the witness through the use of prior false reports to the police and the fact that these false reports related to sexual assaults is a coincidence. The attack on the victim's credibility was grounded in untruthfulness, not in prior sexual activity, according to appellant's theory. Appellant contends that the offered testimony should have been received under the purposes listed in W.R.E. 404(b).[3]

Appellant attempted to introduce evidence that, at some time in the past, the victim had told a person in a bar that she had been sexually assaulted. The court allowed appellant to make an offer of proof. Counsel for appellant asked whether the victim had told people in a bar that she had been sexually assaulted; the victim denied any such conversation. Appellant then offered evidence consisting of a witness who would testify that the victim, in a barroom conversation, told him that she had been sexually assaulted. There is no indication in the record that the victim ever made a police report concerning a sexual assault or that any alleged prior conversation concerning a sexual assault was false.

Since appellant grounds his contention of error on Rule 404(b), we note that in *Gra-*

**2.** W.S. 6–2–312 reads in pertinent part:

(a) In any prosecution under W.S. 6–2–302 through 6–2–305 or for any lesser included offense, if evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim is to be offered the following procedure shall be used:

(i) A written motion shall be made by the defendant to the court at least ten (10) days prior to the trial stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the victim and its relevancy to the defense[.]

**3.** W.R.E. 404(b) states:

*Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*bill v. State,* 621 P.2d 802, 808 (Wyo.1980), this court held the principal test to determine admissibility under W.R.E. 404(b)

is whether or not it tends directly to prove or disprove a consequential fact such as intent or knowledge, or whether or not it may tend to establish a proposition such as motive, which through a series of inferences may tend to establish the probability of a consequential fact such as intent or knowledge.

Appellant's proffered evidence does not meet the criteria for admissibility under W.R.E. 404(b). He did not claim that the victim harbored some resentment toward him, nor that she had any other motive or plan to implicate him. Likewise, there was nothing in the evidence to suggest that the prior assault was reported, or if it was reported, that it was done falsely or to harass. The evidence sought to be introduced would not tend to establish any such fact, and the record does not support any inference that the victim employed some sort of scheme or plan or had any motive to accuse appellant of rape. The excluded evidence would have only served to attack the credibility of the victim. This court, in *Velos v. State,* 752 P.2d 411, 414 (Wyo. 1988), held that evidence of prior sexual conduct used to attack a victim's credibility was inadmissible under W.R.E. 608(b).

Finally, appellant has not presented any authority or cogent argument in support of his contention that the proffered evidence should have been admitted and we need not address the issue further.

### IV

■ In appellant's fourth assignment of error he argues that:

Reversible error was committed when the trial court allowed the state to present witnesses which were not noticed to the defense under the reciprocal discovery provision of Rule 16.1, W.R. Cr.P.[4]

On August 10, 1989, in accordance with W.R.Cr.P. 16.1, the state made demand on appellant for notice of alibi. On August 22, 1989, in response to this demand, appellant listed three alibi witnesses. On September 12, 1989, the state filed a precipe for subpoena listing the state's witnesses. A copy of the precipe was given to appellant's trial counsel about two weeks before trial. Counsel for appellant and appellee discussed the expected testimony of the witnesses and appellant's counsel made notations on the precipe. The state did not further respond to appellant's notice of alibi. The state argues that the witnesses listed in the precipe were the witnesses who would incriminate appellant and, if necessary, also rebut alibi witnesses.

It does not appear that W.R.Cr.P. 16.1 has any application to this case. At trial, appellant did not call the witnesses he had listed as alibi witnesses nor did other witnesses say anything about an alibi. W.R. Cr.P. 16.1 is applicable only if an alibi witness does, in fact, testify at trial.

Appellant brings to our attention *People v. Jarrett,* 22 Ill.App.3d 61, 316 N.E.2d 659 (1974) and *Smith v. State,* 319 So.2d 14 (Fla.1975). In both of these cases, alibi witnesses were called by appellant at trial and the state responded by calling rebuttal witnesses. The Illinois and Florida courts

---

**4.** W.R.Cr.P. 16.1 reads in pertinent part:

(a) *Notice by defendant.*—Upon written demand of the attorney for the state stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten (10) days, or at such different time as the court may direct, upon the attorney for the state a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

(b) *Disclosure of information and witness.*— Within ten (10) days thereafter, but in no event less than ten (10) days before trial, unless the court otherwise directs, the attorney for the state shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

determined that allowing the rebuttal witnesses to testify was error because the state had not disclosed to appellant the names of the rebuttal witnesses.

The cases cited by appellant have no application to the case before this court. Succinctly, there were no alibi witnesses nor any rebuttal witnesses. In any event, appellant cannot in good faith contend that he was surprised that the victim, who was listed as a witness, would incriminate him and place him at the scene of the crime.

Appellant's fourth assignment of error is without merit.

## V

Appellant's fifth assignment of error states: "The prosecutor made improper comment on the defendant's right to remain innocent until proven guilty." As nearly as we can determine from appellant's brief, he makes two complaints in this assignment of error: (1) through questioning, the prosecutor improperly commented on defendant's right to remain silent; and (2) through questioning, the prosecutor suggested that the defendant should prove his innocence.

▮ Detective Stanford testified at trial that appellant was able to identify the pair of eyeglasses as being his.[5] Appellant contends that this testimony constituted an improper comment on his right to remain silent. We cannot follow appellant's reasoning on this alleged error. It does not seem possible that the jury could have determined that the eyeglass identification related to appellant's right to remain silent. Appellant did not testify at trial. Remaining silent at trial cannot preclude the state from introducing statements made by him at another time and place.

· The test for determining what constitutes an improper comment by a prosecutor is set forth in *Knowles v. United States*, 224 F.2d 168 (10th Cir.1955), and adopted by Wyoming in *Oldham v. State*, 534 P.2d 107 (Wyo.1975). The · test, as defined in *Knowles*, is:

> [W]hether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. It is not improper·for the government to draw attention to the failure or lack of evidence on a point if it is not intended to call attention to the failure of the defendant to testify.

*Knowles*, 224 F.2d at 169 (citation omitted).

▮ Other alleged error with respect to the eyeglass identification is discussed in the second assignment of error.

The second incident claimed by appellant to be a comment on his right to remain silent occurred during the testimony of Jalene Griffin, a forensic scientist. Appellant contends that during redirect of this witness, the prosecutor proceeded on a line of questioning which elicited the response that the defendant could have had his own tests made by the state crime laboratory.

By Mr. Forwood

Q. * * * [W]ho does the state crime lab perform work for?

A. Various agencies of Wyoming state.

Q. Such as the prosecutor's office?

A. Yes.

Q. The police?

A. Police departments, sheriff's offices.

Q. Do you do work for a defense agency?

A. That has been done. But I have not personally.

Q. Do you know if that takes place?

A. Yes, it can.

Q. And if defense counsel, for example, requests a test be done, that should be run[?]

MR. SERELSON: Your Honor, because of the presumption of innocence, there's no burden on Mr. Johnson to prove anything.

---

**5.** A more detailed account and discussion of the eyeglass problem is discussed in the second assignment of error.

MR. FORWOOD: Your Honor, I don't want to leave the jury with the impression that the tests are only done for the state.

*Gomez v. State,* 718 P.2d 53 (Wyo.1986) is authority for our determination that, in the case before us, there was no comment, through questioning, on appellant's right of silence. In that case, defendant was convicted of driving while intoxicated. During trial, the prosecutor asked a police officer whether "the defendant ever ask[ed] to be taped so he could preserve that for evidence at trial?" *Id.* at 55. This Court affirmed *Gomez* because "[i]n this case there simply was no comment upon Gomez' exercise of his right of silence." *Id.* at 56. The alleged improper comments in this case are even more innocuous than the comments in *Gomez.* Here, as in *Gomez,* the prosecutor's statements simply do not constitute comments upon appellant's right of silence. Furthermore, the testimony regarding the tests do not suggest that defendant need prove his innocence. The testimony merely shows that the state laboratory facility is not exclusively available to the police, sheriff or the prosecution.

## VI

Appellant, in his pro se supplemental brief filed with this court, raises six issues, none of which are supported by authority or cogent argument. Footnote 1 sets out the issues raised by appellant pro se.

 In his first pro se issue, appellant contends that it was error for the district court to sentence him as a habitual criminal because, when he pled guilty to prior felonies, the court failed, during the plea hearings, to inform him that his guilty pleas may be later used against him in a habitual criminal hearing.

In *Carson v. State,* 755 P.2d 242, 244 (Wyo.1988), the court held that the "trial court's duty to insure that a defendant understand the consequences of a guilty plea before he enters one extends only to *direct* consequences of such a plea." Possible use of the guilty plea at a later habitual criminal proceeding for sentence enhancement of a subsequent conviction is a collateral consequence. Under W.R.Cr.P. 15, the trial court is not required to inform the defendant of all the possible collateral consequences.

In Issue II raised pro se by appellant, he claims that State's Exhibit 12 was altered. The exhibit was a photograph of an area in the victim's apartment. When Exhibit 12 was identified by Detective Spencer at trial, he marked the spot where he found appellant's identification. The exhibit was received into evidence. Appellant's pro se argument with respect to Issue II is spurious.

Appellant's pro se Issue V addresses remarks made by the prosecutor concerning what appellant was wearing on the night of the attack. While the actual items of apparel were not introduced into evidence, there was testimony from witnesses concerning the attire of appellant on the night of the attack. The attire of appellant was introduced as testimonial evidence rather than physical evidence. This testimony supports the statements made by the prosecutor. In support of this issue, appellant cites venerable Ruling Case Law (22 R.C.L. 104 (1918)) explaining the duties of the district attorney. The excerpt from R.C.L. has nothing to do with this case.

In pro se Issues III, IV and VI, appellant makes reference to perjured testimony and false evidence. In a pro se reply brief, appellant attempts to raise still another issue. In this brief he charges the attorney general with perjury. Appellant has an obsession with perjury. His concept of perjury is that if a statement is contrary to his version of a fact, it is perjury. There is no merit to appellant's perjury argument.

We have carefully considered the five issues raised by appellate counsel. We have also considered the six issues plus one raised by appellant pro se. We do not find reversible error.

Affirmed.

URBIGKIT, C.J., files a dissenting opinion.

**1292**

URBIGKIT, Chief Justice, dissenting.

The more I carefully analyze what this court considers, disclaims and determines in this case, the more constitutional concerns develop from what in first review would seem to be a simple identification rape conviction appeal. Within the constitutional concerns of Andrew J. Johnson's conviction, there is a life sentence provided by habitual criminal enhancement. *Weldon v. State*, 800 P.2d 513 (Wyo.1990). With that result, I cannot so lightly pass by Johnson's denied right to counsel and his coerced incriminatory statement, both of which raise basic constitutional questions.

Among the eleven issues raised by Johnson, there are three issues which cause me particular concern.

## I. WAIVER OF JURY BY DEFENDANT

I am not satisfied with the majority's conclusion. I do not believe **the Wyoming Constitution** provides a right for the State to require a jury trial in a criminal case. If a defendant cannot waive a jury trial, then it means the State has a correlative right for the same remedy. I find that Wyo. Const. art. 1, § 10 does not justify adaptation of W.R.Cr.P. 24(a), which states that "[c]ases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing **with the approval of the court and the consent of the state.**" (Emphasis added.)

The philosophic problem with adaptation by this court of such a qualified waiver thesis for constitutional rights is that such an affixation to the constitution cannot properly—or logically—be confined to a right of a jury trial. The long litany that this court has developed about forfeiture and waiver for defense to constitutional right violation would be confined not just to action of the accused, but also to interaction and approval of waiver by the trial court and prosecutor. The morass of ineffectiveness of counsel, waiver and forfeiture of constitutional rights would now be corralled by agreement and consent not released to unintended mistake or intentional miscalculation. *Cutbirth v. State*, 751 P.2d 1257 (Wyo.1988).

If the accused cannot intentionally waive constitutional rights, it surely does not make sense—or provide justice—when the waiver unintentionally surfaces from ineffectiveness of counsel. Consequently, I find no provence under the Wyoming Constitution to limit release of the right for a jury trial to secure trial by the court even when resisted by prosecutorial veto. The Wyoming Constitution simply does not provide a right for the **State** to have guilt determined by a jury instead of the trial court.

I am aware of the history of federal cases and other state cases, including *Singer v. United States*, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630, 638 (1965), and other cases cited in Annotation, *Right of Accused, in State Criminal Trial, to Insist, Over Prosecutor's or Court's Objection, on Trial by Court Without Jury*, 37 A.L.R.4th 304 (1985), but those courts have not adapted the omnipotent effectuation of waiver and forfeiture found in decisions of this court in *Murray v. State*, 776 P.2d 206 (Wyo.1989); *Kallas v. State*, 776 P.2d 198 (Wyo.1989); *Amin v. State*, 774 P.2d 597 (Wyo.1989); *Campbell v. State*, 772 P.2d 543 (Wyo.1989); and *Cutbirth*, 751 P.2d 1257.

Consistency, which is an ingredient of both due process and equal protection, should not be just a motto of desired behavior but also the standard of application of the justice delivery system within the confining structure of the Wyoming Constitution. *Holm v. State*, 404 P.2d 740 (Wyo. 1965). If the accused defendant is required to stand subject to constitutional retrogression by an unintended mistake and counsel failure, he should also be entitled to affirmatively waive the one right remaining—to give up a jury trial in order to have a decision by the trial court. The challenge for consistency of burdens and benefits for the accused—and the prosecution—should not go unanswered in constitutional concepts of due process and equal protection.

## II. INTERROGATION OF A REPRESENTED ACCUSED

A significantly more divisive and clearly more obvious problem with this majority decision is created by its analysis of the renewed interrogation of a represented accused addressed in Section II of the majority opinion. The police strategy may have been effective, but surely not acceptable when crossing constitutional barriers limiting investigatory activities.

In simple fact, the police officer, Detective Stanford, initiated interrogation of Johnson in jail without the presence of counsel. That much cannot be questioned. Whether it was proper or harmless leaves for discussion my serious disagreement with the majority opinion and the clear difference about application of the definitive and explicit decisions of the United States Supreme Court.

Essentially what happened is that a couple of days after the crime, the victim found some strange glasses in her apartment which she believed might have been owned by the rape perpetrator. She called the Detective Stanford and he picked up the glasses. Several days went by during which the detective attempted to develop ownership by a contact with optical sources. Johnson came to believe that the police had his glasses without which he could not normally function and made demand for their delivery to assist his general accommodation in jail. Johnson became insistent that his glasses be returned. He did not know that the glasses could become significant evidence since found in the victim's apartment.

The police detective carefully elected not to bring defense counsel into an interrogation session where the incriminating identification could be obtained. Johnson, while in custody, was within a coercive environment. The events were discussed in a suppression hearing where, after identification of the witness as a Cheyenne, Wyoming Police Department detective, that officer testified:

Q. Did there come a time when you became involved in a piece of evidence involving a pair of glasses in this case?

A. Yes.

Q. And what was your involvement in that situation?

A. On June 13, 1989, the victim in this case called me to her apartment. She stated that she had found a pair of glasses that she believe belonged to Mr. Johnson.

Q. How long was this after the incident?

A. Two days.

Q. Okay.

A. I took the glasses into evidence. I didn't have any way to determine exactly who they belonged to.

Q. Well, what did she tell you?

A. She said she believed they were Mr. Johnson's.

Q. Okay. Why did you place them in evidence?

A. They didn't belong to her, and I didn't know that they weren't evidence.

\* \* \*

Q. And as the detective-investigator on this case, what was your intent of saving the glasses? What purpose would they serve in the case?

A. I wanted to try and find a way to determine whether or not the glasses did in fact belong to Mr. Johnson.

Q. And how would that be helpful to your investigation?

A. It would place him in the bedroom of the apartment.

Q. Is that an important part of the case,—

A. Yes,

Q. —placing the defendant at the scene of the crime?

A. Yes, it is.

Q. And then when did you next become involved with the glasses?

A. Several days after that I took them to an optical shop here in town, to try, for lack of anything better to do, to try and find out what the prescription was on the lenses.

Q. Okay. And then what did you do with the glasses?

A. Put them back into evidence.

Q. And when was your next involvement with the glasses?

A. I believe it was the 29th. I can check my note real quick. Yes, on the 29th I was—June 29th I was advised by the jail that Mr. Johnson was requesting his glasses, saying that we were holding them as evidence.

Q. And then what did you do?

A. I took them over to the jail myself, with Sergeant Kaine and another deputy.

Q. What was your purpose in taking them over there?

A. To determine if they were, in fact, Mr. Johnson's glasses that he was asking for.

Q. Were you intending to give him his glasses, if they were his?

A. No.

Q. Why not?

A. Because I was still holding them as evidence.

Q. They still held the same purpose for evidence as they held before?

A. Correct.

Q. Would it be fair to say that that was your intent, to get an identification of the glasses?

A. That's correct.

Q. Would it be fair to say that that intent was for future use at trial, if Mr. Johnson denied that those were his glasses?

A. If he would have denied it, then they would of had no further evidentiary value.

Q. But if he admitted it, then it would have evidentiary value?

A. I believe so, yes.

Q. And that was your purpose for going over there?

A. That's correct.

Q. And what date did you go over there?

A. The 29th, I believe.

Q. And where did you go?

A. To the north annex of the county jail.

Q. Where was Mr. Johnson residing at that time?

A. He was in that annex.

Q. In custody?

A. Yes.

Q. And what did you do when you got over there?

A. I showed him the glasses, and I—I don't recall the exact words, but I believe I asked him if they were his, and he responded affirmatively.

Q. "Yes"?

A. "Yes."

Q. He said yes?

A. I don't recall exactly, but, yes, he indicated that they were his glasses.

Q. Okay.

A. I asked if he would like to try them on to make sure, and he indicated that he didn't need to.

Q. And then what happened?

A. And then I told him it would be up to Mr. Forwood as to whether or not the glasses would be released.

Q. This was now about two and a half to three weeks after the alleged incident?

A. That's correct.

Q. And you were aware that Mr. Johnson had been in custody for about two and a half to three weeks?

A. Yes, I was.

* * *

Q. So, when you confronted him with the glasses on the 29th, you were aware that he was represented by myself?

A. That's correct.

Q. Did you read Mr. Johnson his Miranda rights prior to your conversation with him?

A. No, I did not.

Q. Are those glasses still in evidence?

A. I believe so.

Q. Did you return them to evidence after that conversation?

A. Yes, I did.

Without question, this was interrogation—in jail—without the presence of Johnson's counsel for the purpose of developing an incriminatory "confession." Two things could have occurred—the police detective could have told Johnson where the glasses were found or, more appropriately, could have contacted the appointed defense counsel to check ownership or to be present to advise Johnson before any statement was made. Neither was done and this court now applies a harmless error resolution to the constitutional deprivation of right to counsel under both the state and federal constitutions. Wyo. Const. art. 1 § 10; U.S. Const. amend. VI.[1]

It may be, as the majority suggests, that other processes for the identification of the glasses could have been successfully used by prosecution. It may also be that, considering other evidence introduced, the eye glass identification was unnecessary for conviction. Both are clearly only suppositions, undocumented by factual determinations within this record. What we do know is that Johnson's constitutional right to counsel should have been protected by sustaining suppression of the non-counseled admission during interrogation in jail. Although the Sixth Amendment was implicated in the constitutionally impermissible police conduct, I would suggest that a Fifth Amendment violation issue is even more persuasively presented.

The United States Supreme Court has spoken emphatically this current term about the use of incriminatory testimony obtained in the absence of counsel as a violation of the Fifth Amendment to the United States Constitution within the purview of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh'g denied* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981) and *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, *reh'g denied sub nom. California v. Stewart,* 385 U.S. 890, 87 S.Ct.

11, 17 L.Ed.2d 121 (1966). In *Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), Minnick, as a fugitive from a killing in Mississippi, was arrested in California and held on a fugitive warrant in the San Diego jail. He was first interviewed by FBI agents, which resulted in his request to have an attorney present. An attorney was appointed and met with him, or at least had contact with him, on two or three occasions. Following those contacts, a sheriff's officer from Mississippi came to the California jail to question Minnick, who was then advised by his jailers that he would have to talk to the deputy sheriff. It was the statement then given to the Mississippi sheriff's officer, without requested counsel present, that became the subject of the decision by the United States Supreme Court following a death penalty conviction where the evidence was used in the Mississippi trial.

The United States Supreme Court, for the *Minnick* decision, did not reach any Sixth Amendment implications in the case, but determined that Fifth Amendment protection had not been terminated or suspended by consultation with counsel so that the non-counseled interview should not have been pursued. By application of *Edwards,* 451 U.S. 477, 101 S.Ct. 1880 and *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, as followed by *Patterson v. Illinois,* 487 U.S. 285, 291, 108 S.Ct. 2389, 2393–94, 101 L.Ed.2d 261 (1988), the United States Supreme Court succinctly delineated the rule:

> In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

*Minnick,* 111 S.Ct. at 491. The United States Supreme Court further stated:

---

**1.** In other filings in this court, Johnson questioned whether the glasses were actually his as

contested by requested comparison with an identification photograph.

We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.

\* \* \* \* \* \*

Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system. It does not detract from this principle, however, to insist that neither admissions nor waivers are effective unless there are both particular and systemic assurances that the coercive pressures of custody were not the inducing cause. The *Edwards* rule sets forth a specific standard to fulfil these purposes, and we have declined to confine it in other instances. *See Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). It would detract from the efficacy of the rule to remove its protections based on consultation with counsel.

*Id.* 111 S.Ct. at 491–92.

The strategy employed to obtain the admission from Johnson does not bring these events within the province of a waiver of Fifth Amendment protections such as when the accused might reinitiate the discussions. There can be no doubt that the interrogation in question was initiated by the police detective—it was a formal interview which Johnson was compelled to attend. Since Johnson made a specific request for and had obtained counsel before the interview, the police-initiated interrogation was impermissible. Johnson's statement to Detective Stanford is clearly inadmissible under the principles of *Minnick*.

It misshapes the facts of this case to suggest that coercion and compulsion were not present. Johnson was in jail, he needed the glasses for normal living and there is no evidence that he knew that original custody of the glasses had been obtained from the victim's apartment by the police. The activity then pursued by subterfuge, as it was, by the police was not to make the glasses available for Johnson's use, which they did not, but rather to authenticate trial evidence by coercive interrogation.

I take exception to the majority's notion that a visually handicapped person initiates " 'communication, exchanges, or conversations with the police' " sufficient to waive Fifth or Sixth Amendment rights to counsel by asking for his corrective lenses. (Quoting *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885.) "[C]ourts indulge in every reasonable presumption against waiver [of the right to counsel]." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, *reh'g denied* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977). What happened here is no different in principle than keeping an artificial limb from an amputee until he initiates "communication" by asking for his artificial arm or leg. People's handicaps should not be exploited. I also take exception to that part of the majority opinion which expresses no disapproval regarding the behavior of the police detective. While harmless constitutional error may be possible under *Chapman v. State of California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, *reh'g denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967), any intentional behavior which leads to the need for a *Chapman* analysis should be discouraged. The behavior of the police detective appears to have been intentional—such behavior places the conviction at serious risk of reversal. I believe the judicial system does a disservice to the Republic when we discount, by our silence, such inappropriate behavior by governmental employees.

Second, I believe the police detective's behavior violated a Fifth Amendment right to counsel rather than involving only a Sixth Amendment right to counsel as indicated by the majority opinion. *Minnick*, 111 S.Ct. at 487 held that "[w]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick* was based upon the Fifth Amendment right to counsel. Under the facts revealed by the majority opinion, the police detective initiated an interrogation without Johnson's counsel being present. *Minnick*, 111 S.Ct. at 490 (quoting *Miranda*, 384 U.S. at 466, 86 S.Ct. at 1623).

spotlighted the common purpose to *Edwards* and *Miranda,* which is to " 'insure that statements made in the government-established atmosphere are not the product of compulsion.' "

The majority then proceeds with what I believe has to be a *Minnick* violation by a *Chapman* analysis sufficient to obviate reversible error. The majority holds that "the state's evidence against appellant is so overwhelming that the error is harmless beyond a reasonable doubt." The United States Supreme Court disapproved of this "overwhelming evidence" approach in *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827. " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827 (quoting *Fahy v. State of Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In the absence of proof from which a foundation for introduction of the glasses into evidence could be obtained, a character of non-contribution required for constitutional error absolution surely cannot be implied into this case. Speculation as to what other investigation and identification could have made the glasses admissible into evidence introduces a significant bundle of unknown and non-evidentiary hypothetical straws into the completed product which was the verdict of conviction.[2]

There is greater mischief to be observed in reading the majority opinion than what appears to be presented. In the last sentence covering this issue it is stated "[t]here is no possibility that, in the absence of the error, the verdict would have been more favorable to appellant." (Citing *Campbell v. State,* 589 P.2d 358, 367 (Wyo. 1979).) If *Campbell* did elicit that concept, it was then and is now just plain wrong. The result-emplaced basis for a harmless constitutional error rule was specifically and directly rejected in *Chapman* and the substantial right principle applied. Any statement taken from the *Campbell* case directed to result and not to affect cannot withstand scrutiny on a constitutional right violation inquiry, and the *Campbell* dissent was clearly correct in analysis of a *Chapman* application. The same result remains true today. That rule was reemphasized in *Satterwhite v. Texas,* 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798–99, 100 L.Ed.2d 284 (1988) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828 and emphasis added) as examining "whether the State has proved 'beyond a reasonable doubt that the error complained of *did not contribute to the verdict obtained.*' " *See likewise Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828 and emphasis added), where the United States Supreme Court again emphasized the test of constitutional error is that it " '*did not contribute to the verdict obtained*' " and *United States v. Hasting,* 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (citing *Fahy,* 375 U.S. at 86–87, 84 S.Ct. at 230–31) which was the case where the rule also recognized the substantive right, not the plausibility of a different verdict, as the required test. Furthermore,

---

**2.** I am not satisfied that a pure harmless error *Chapman* examination is appropriate in these cases of interrogation of a defendant without the presence of his attorney who had already commenced representation. It would seem that anything obtained of evidentiary value which is sufficient to be admitted into evidence as relevant and material should be excluded and, conversely, if the wrongfully obtained testimony does meet relevancy and materiality tests, such evidence cannot be considered to be beyond the criteria of a reasonable possibility of contribution to conviction. If the evidence is probative for admissibility, it is probative to add weight to accomplish conviction. Information obtained by the police from a represented defendant should simply not be admissible in evidence as an empirical practice of prosecution unless a clear and defined *Edwards* waiver is demonstrable. *See Chapman,* 37 S.Ct. at 828 n. 8. Two of the three examples of constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error are implicated here. Those are coerced confessions, *Payne v. State of Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); right to counsel, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and impartial judge, *Tumey v. State of Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). It is also noteworthy that even within the strongly stated dissent of Justice Scalia in *Minnick,* which was premised on waiver, possible application of a *Chapman* harmless error was never presented.

at least with this issue, a like result was found in *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), where an "outcome determinate" prejudice was rejected as the test of reversible error for violation of the Confrontation Clause. *See also Mahorney v. Wallman,* 917 F.2d 469 (10th Cir.1990).

This court may try to restrict the protection of the Wyoming Constitution, but it surely cannot ignore the recognition that the United States Constitution, as applied by the United States Supreme Court, is the supreme law of the land. One could factually differentiate *Campbell* as a misidentification controversy from a basic constitutional issue review, which is the subject here presented of coerced confession and right to counsel. Admission of the unconstitutionally obtained incriminatory testimony requires reversal and retrial.[3]

### III. LIMITATION OF EXAMINATION TO IMPEACH A WITNESS

Johnson attempted to impeach the prosecutorial witness regarding a contended prior complaint that she allegedly made of sexual assault. The trial court rejection of available evidence after the witness denied the occurrence was clearly improper if based on the concept of a rape shield preclusion. W.S. 6–2–312. This court now

justifies countervailing that rejection under a W.R.E. 404(b) thesis. First, I perceive a double standard by this court for admissibility of evidence, whether tendered by prosecution or defense. Essentially, the inquiry was no different than that used against Johnson regarding conviction of prior offenses. *Gentry v. State,* 724 P.2d 450 (Wyo.1986), Urbigkit, Justice, dissenting. The significance from a defense standpoint within the case, although tough at best to defend, was that a prior police report *may not* have been made or, in fact, the complaint was false.

I neither agree with the cursory disposition of this subject on the basis of lack of cogent argument or the switch in basis for decision providing a pro forma recognition that the stated reason for the decision by the trial court was wrong. At issue was a challenge to credibility by impeachment of the witness. Result-oriented absolution based on relevancy or remoteness could have greater validity, *but not the basic right to impeach by challenging credibility.* W.R.E. 607 and 608(b). *See Story v. State,* 721 P.2d 1020, 1038 (Wyo.), *cert. denied* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986); *Chapman v. State,* 638 P.2d 1280 (Wyo.1982); and *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

---

**3.** Illustrative of the issues presented is the offer of proof bypass decision of *People v. Whitt,* 51 Cal.3d 620, 274 Cal.Rptr. 252, 798 P.2d 849 (1990), where a *Skipper* error was at issue. *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Justice Mosk of the California Supreme Court, in concurrence and dissent, stated:

Under *Chapman,* "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24, 87 S.Ct. at p. 828.) The "burden of proof" as to prejudice rests on the state. "Certainly error, constitutional error, * * * casts on someone other than the person prejudiced by it a burden to show that it was harmless * * *. [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.*)
*Whitt,* 798 P.2d at 876. Then Justice Kennard added:

Under California law, error in a criminal case is considered harmless unless the defendant can show it resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13; *People v. Archerd,* 3 Cal.3d 615, 643, 91 Cal.Rptr. 397, 477 P.2d 421 (1970).) This means the defendant must demonstrate that without the error "it is reasonably probable a result more favorable" to the defendant would have been reached. (*People v. Watson,* 46 Cal.2d 818, 836, 299 P.2d 243 (1956).) In *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1966), the United States Supreme Court rejected California's "miscarriage of justice" test as inappropriate for evaluating federal constitutional error. Under *Chapman,* "the beneficiary of a [federal] constitutional error" must prove beyond a reasonable doubt "that the error complained of did not contribute to the verdict obtained." (*Ibid.*) Thus, when the error violates the federal Constitution, the defendant need not show prejudice; rather, the *prosecution* must establish the *absence* of prejudice.
*Id.* at 880–881 (emphasis in original).

## IV. CONCLUSION

Among the several issues advanced by Johnson in seeking to obtain reversal of his life sentence and obtain a new trial on his rape conviction, there are three issues about which I am left with particular concern in permanent effect on Wyoming law and the Wyoming Constitution by this majority's analysis and decision. Obviously, the *Minnick* reanalysis and reapplication of longstanding basic constitutional principles is singularly the most significant and consequently the most severely troubling. Direct questions about enforcement of both the Wyoming Constitution and the Fifth and Sixth Amendments to the United States Constitution are provided within our agenda in this decision. I conclude that this majority not only misstates the proper tests, but then misapplies whatever concept is then used to find justification in absolving constitutionally prohibited investigatory overreaching. We write badly here not only to decide this case as it involves fundamental constitutional interests, but also to prepare and instruct for the future in justice delivery system operation and court decision.

Consequently, I respectfully dissent.